SIXTH DIVISION

No. 1-08-0645

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| | ) | |
| | ) | No. 97 CR 26083 |
| v. | ) | |
| | ) | |
| CESAR MUNOZ, | ) | Honorable |
| | ) | Marcus R. Salone |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This case arises from the shooting of the victim, Magdaliz Rosaria, which occurred on September 8, 1997, at 1707 North Artesian Avenue in Chicago. Prior to her death, the victim lived at the aforementioned address with her boyfriend, the defendant, Cesar Munoz. On October 19, 1997, the defendant was charged with the victim's murder on October 19, 1997. This case was subsequently tried three times. Each time the central issue at trial was to determine whether the death occurred as a result of a homicide or as a result of a suicide, as the defendant maintained.

The case was first tried on May 3, 2000. The first jury to hear the case was unable to reach a verdict, and a mistrial was declared on May 7, 2000. A second trial commenced on November 2, 2000, and the defendant was again tried by a jury. This time, the jury returned a verdict finding the defendant guilty of first-degree murder. That conviction, however, was reversed by this appellate court on May 3, 2004, by reason of (1) the trial court's error in barring

1

evidence of the victim's suicidal state of mind prior to her death, *i.e.*, certain declarations that she had made, which indicated suicidal ideation; and (2) the improper testimony of the State's expert pathologist who was permitted to testify, over defense counsel's objection, that in forming her opinion as to the manner of the victim's death, she was certain of her conclusion "beyond a reasonable doubt," thereby invading the province of the jury. See People v. Munoz, 348 Ill. App. 3d 423, 810 N.E.2d 65 (2004).

On September 27, 2007, upon remand to the trial court, the defendant's case was tried by a jury for the third time. The defendant was found guilty of first-degree murder and subsequently sentenced to 45 years' imprisonment. This appeal follows, and the defendant now raises six contentions of error. These include: (1) that the trial court erroneously admitted into evidence several hearsay statements made by the victim while she was alive; (2) that the trial court erred when it permitted two policemen, Officer Rivera and Detective Rutherford, neither of whom was qualified as an expert in gunshot residue testing, to testify about gunshot residue transference; (3) that the trial court erroneously permitted the State's expert forensic pathologist, Dr. Jones, to again invade the province of the jury by testifying that the manner of the victim's death was homicide "beyond a reasonable degree of medical certainty," and by opining on the credibility of the defendant's assertions to police that the victim's death was a suicide caused by depression; (4) that the trial court erred when it permitted Detective Rutherford, who questioned the defendant after his arrest, to give testimony as to the ultimate issue of the defendant's credibility, and (5) that the prosecutor engaged in pervasive prosecutorial misconduct during closing argument by repeatedly and improperly shifting the burden of proof onto the defendant, thereby prejudicing the outcome of the trial. Lastly, the defendant challenges the sufficiency of the

2

evidence used to convict him. For the reasons that follow, we reverse and remand.

## I. BACKGROUND

The record below reveals that the following relevant evidence was adduced at the defendant's third trial.

### A. State's Case in Chief

Lizette Hidalgo first testified on behalf of the State. She stated that she was the victim's sister and that on September 8, 1997, the victim was 21 years old and lived at 1707 North Artesian Avenue, Chicago, with the defendant, who was her boyfriend. Hidalgo also testified that she last saw her sister alive on September 1, 1997. On September 8, 1997, Hidalgo was contacted by the police, who informed her that her sister was dead and asked her to identify the body. In court, Hidalgo identified photographs of the victim taken prior to the incident and photographs of the victim taken in the medical examiner's office. She also stated that the victim was right handed.

On cross-examination, Hidalgo explained that the victim was not her biological sister. The victim was Hidalgo's cousin, but Hidalgo's mother adopted her, and the victim and Hidalgo lived as sisters. Hidalgo conceded that the victim's biological mother, Hidalgo's aunt, never visited the victim.

Richard Flores next testified for the State. He first acknowledged that he is currently housed at the Indiana State Penitentiary for a parole violation in an unrelated robbery conviction. Flores also admitted to having an outstanding arrest warrant in Connecticut. Flores, however, denied making a deal with the State in exchange for his testimony in the defendant's trial.

Flores next said that he first met the defendant and the victim in 1995 and that they

3

became good friends. According to Flores, at that time, the defendant and the victim lived together with the victim's daughter, Lucy, in an apartment somewhere on LeMoyne Avenue in Chicago, which was owned by the defendant's father. Flores stated that at some point, the defendant and the victim asked him to move into this apartment with them to help pay their rent. Even with Flores' temporary help, however, the defendant and the victim were unable to make their rent payments and were soon forced out of the apartment and into a new one at 1707 North Artesian Avenue. Flores did not move with the defendant and the victim at that point, but went to live with his mother at 4744 West Byron Street.

Flores stated that sometime in June or July 1997 he became romantically involved with the victim. Flores explained that at that time he worked at Luna Security[1] and that the victim had come to him more than once asking if he could help her find employment there. Over defense counsel's objection, Flores was next permitted to testify that during these visits, the victim would also complain to him about her relationship with the defendant, telling Flores that "the defendant had been jealous of her," that he " wanted to know where she was and what she was doing all the time," and that she had become unhappy. The victim further told Flores that she wanted a job so that she could become independent from the defendant. Flores explained that, at that time, neither the defendant nor the victim had been employed but that, instead, they lived on public aid that the victim was receiving for her children.

According to Flores, sometime in August 1997, about two months after he began his affair with the victim, the victim asked him to move in with her into the apartment at 1707 North

---

[1]Flores explained that as part of his employment at Luna Security, he performed crowd control duties at concert venues and sports stadiums, and he never carried a weapon.

4

Artesian Avenue, which she was then sharing with the defendant and her three children. Flores explained that after he moved in, the household consisted of the defendant, the victim, himself, and the victim's three children: Lucy, the victim's child from a previous relationship (4 years old), and Talissa (1 ½ years old), and Katherine (5 or 6 months old), children that the victim had had with the defendant.

Flores described the residence as a two-bedroom apartment with a kitchen, living room, bathroom, and an additional small room. According to Flores, the defendant shared a bedroom with the victim, and the three girls shared a small room between the bedroom and the living room, while Flores himself slept in the living room. Flores admitted that he continued his relationship with the victim when he moved into her apartment and that the defendant never learned of it.

According to Flores, during that time, the victim continued to express her feelings about her failing relationship with the defendant and her desire to "get away from the defendant." Flores testified, however, that throughout that time the victim never told him that she wanted to kill herself or that she wanted to leave her children. In fact, Flores was adamant that the victim loved her children "very much."

Flores next testified that at the victim's request, he made an appointment for her to seek employment with his supervisor at Luna Security on September 8, 1997. According to Flores, on that morning at about 8 a.m., he and the victim were preparing to leave the apartment, while the defendant was to stay behind and watch the children, who were asleep, when the defendant called the victim back to talk to her. Flores waited in the car while the victim and the defendant spoke. He could therefore not hear the content of their conversation or observe either the victim or the

5

defendant.

Flores then drove the victim to Luna Security at 1233 West Eerie Avenue, where she proceeded to fill out a job application and speak to Flores' supervisor. Flores testified that while the victim was filling out her job application, he went outside to smoke, whereupon he ran into the defendant. The defendant, who did not own a vehicle, had come to Luna Security in his brother's truck, bringing the three children with him. The defendant told Flores to get the victim, because "a representative from the Department of Children and Family Services (DCFS) had just been to their apartment." Flores went back inside and told the victim what the defendant had said, but "she only smirked back at him." Flores went outside and watched as the defendant entered Luna Security, with the victim's youngest daughter in hand, and spoke to the victim. Flores conceded that it did not appear to him at any point during that conversation, or for that matter, in the course of that entire morning, that the defendant had been upset or angry.

Flores next testified that soon thereafter the victim left Luna Security and headed home with the defendant and her children. According to Flores, at that point, the victim appeared to be very happy because she had been hired on the spot to act as an usher at 12 of Northwestern University's upcoming home games. Flores met up with the defendant and the victim about 15 minutes later in front of the apartment building at 1707 North Artesian Avenue. Flores arrived first and spoke to a mutual friend who was standing next to the building, when the victim and the defendant arrived. Flores again testified that, at this point, the victim appeared very pleased with herself because of her new-found employment. Flores further admitted, however, that at this point, the defendant, who was sitting next to the victim in the truck while she was driving, did not seem at all upset or angry. Flores also noted that it was the first time since he had met the

victim that he had seen her driving and that this was unusual.

According to Flores, the victim then walked a few houses over to return the truck key to the defendant's brother, who lived nearby. She returned soon thereafter and Flores told her that he needed to run an errand. The victim then asked him to help her clean the house upon his return, because the defendant had "made a mess," and Flores promised her that he would. However, when Flores returned about an hour later, he saw police cars in front of the building and learned that the victim was dead.

Flores was next shown a series of photographs of the apartment at 1707 North Artesian Avenue, taken at the scene of the crime, and asked whether those photographs depicted the apartment as it was on the morning of September 8, 1997, before he left for Luna Security with the victim. Flores explained that the apartment was generally messy, but he stated that since his departure for Luna Security several items appeared to have been disturbed. First, Flores explained that, unlike the conditions depicted in the photographs, on the morning of the incident there were no hangers, socks, notebooks or magazines on the floor of the victim's bedroom. Nor were there flipped-over chairs or a broom and a hat on the living room floor. Flores also said that the floor of the hallway was not scattered with clothes. Flores finally explained that when he left the apartment with the victim on the morning of the incident, there was no blood anywhere in the apartment but that the photographs taken at the scene of the crime after the incident depicted blood on the floor of the hallway, in the living room, in the victim's bedroom, and on the victim's bed.

Flores next identified a gun, which he was shown, and testified that it belonged to the defendant. Flores explained that this gun was kept "either in the closet or under the mat" in the

7

bedroom shared by the victim and the defendant. Over defense counsel's objection, Flores was permitted to testify that the victim did not like having the gun around the house because of the children. Flores also testified that he never saw the victim hold or touch the weapon.

On cross-examination, Flores admitted that he often entered the apartment on Artesian through a side door, which led to a gangway and a front gate. He admitted that neither the side door nor the front gate was ever locked and that several friends of the victim and the defendant knew that they could enter the apartment this way without a key.

On cross-examination, Flores further acknowledged that he never told the defendant that he had an affair with the victim and that he had no reason to think that the defendant was aware of the affair, as he and the victim had taken pains to conceal it. Flores further admitted that he and the victim had no intention of moving out of the apartment together.

Flores next acknowledged that the defendant did not object or become angry when Flores took the victim to Luna Security on the morning of September 8, 1997. In fact, Flores admitted that, before he and the victim left for Luna Security, the defendant called the victim back to the apartment because "he did not want to watch the children."

Flores also testified on cross-examination that after they all returned from Luna Security and stood in front of the apartment building, he told the victim and the defendant that he would return to the apartment "after he ran an errand." Flores admitted that he never told the defendant how long this errand would take and acknowledged that he "might have returned at any time."

On redirect examination, Flores admitted that he did not know whether defendant was aware of his affair with the victim, as he did not know if the victim had ever disclosed the affair to the defendant. Flores further stated that in all his time living in the apartment at 1707 North

8

Artesian Avenue, he never saw anyone attempt to open the bedroom door with a nail, nor did he ever see nails lying on the floor near the bedroom door. He stated, however, that when the bedroom door was locked, it could be opened from the outside by using a butter knife, and he had seen this done in the past.

Chicago police officer Norbert Rivera next testified that on September 8, 1997, he was in uniform and in a squad car working the morning shift when at approximately 12:30 p.m. he responded to an emergency call of a person shot at 1707 North Artesian Avenue. Officer Rivera proceeded to the address, which he described as a multi-unit two story building located on a residential street with two-story homes throughout the area. According to Officer Rivera, a squad car was already parked at the scene and a group of people was congregated in the gangway of the residence. Officer Rivera testified that he proceeded through the gangway and up a flight of stairs to the second floor, where he observed several officers and the paramedics treating a young woman who was lying facedown on the floor with a lot of blood around her. Officer Rivera later learned that the young woman was the victim, Magdaliz Rosaria.

Officer Rivera testified that when he loudly asked whether "the victim's husband was around," a man who was standing next to him, whom he later learned was John Berrios (the defendant's cousin), advised him that he would find the defendant across the street at 1704 North Artesian Avenue and then proceeded to take him there. Officer Rivera went to this address and questioned the defendant there. According to Officer Rivera, when he first observed the defendant, the defendant was not crying, and did not seem upset, but merely sat in a chair in the middle of the apartment. Officer Rivera had to ask the defendant a couple of times to tell him what had happened before the defendant even spoke. The defendant then told Officer Rivera that

9

he and the victim had gotten into a fight and that she ran into the bedroom, closing the door behind her. The defendant then heard "a loud pop"and had to force the door open to go inside. The defendant told Officer Rivera that he picked up the victim, carried her out of the room, and called 911. When questioned about the gun, the defendant first remained silent, then told Officer Rivera that he threw it into a garbage can behind the house. Thereafter, Officer Rivera escorted the defendant to the four garbage cans located behind the building at 1707 North Artesian Avenue, where he unsuccessfully attempted to find the gun. The defendant then pointed out the garbage can where he had thrown the gun and helped Officer Rivera locate the weapon. Officer Rivera testified that the gun was about a foot and a half inside the four-foot-deep garbage can.

Officer Rivera then handcuffed the defendant behind his back, positioned him in the back of the squad car and escorted him to the station. Upon instruction from supervising detectives, Officer Rivera made sure that the defendant did not wash his hands or wipe his hands prior to being placed in the squad car. Officer Rivera admitted, however, that at that time he did not know that the detectives intended to test the defendant for gunshot residue. Officer Rivera further acknowledged that he had never transported a person for the purpose of having a gunshot residue test performed and was not aware of how gunshot residue can be transferred to another surface.

Over defense counsel's objection, Officer Rivera was permitted to testify that subsequent to the defendant's arrest, a detective named Slater[2] informed him that gunshot residue evidence can be lost and transferred by an individual wiping his hands on the seat of a car.

On cross-examination, Officer Rivera admitted that he never trained in gunshot residue

---

[2]We note that Detective Slater never testified at trial.

tests and that he never performed or analyzed results of such tests. In addition, Officer Rivera admitted that he noticed nothing unusual while the defendant was being transported to the police station in the back of the squad car and that he never observed defendant wiping his hands or moving back and forth in his seat.

On cross-examination, Officer Rivera also admitted that at the defendant's prior trial in May 2000, he had testified that when he first questioned him about the incident defendant "did not hesitate to tell [him] what happened."

Detective Edwin Dickinson next testified that at about 1:30 p.m. on September 8, 1997, he interviewed the defendant at Area 5 police station. Detective Dickinson stated that prior to speaking with the defendant, he introduced himself and read the defendant his Miranda rights from a Fraternal Order of Police (F.O.P.) book. The defendant indicated to Detective Dickinson that he understood those rights and wished to speak to the detective. The defendant then told Detective Dickinson that he was jealous of Flores and "pissed off" when on the morning in question the victim went with Flores to apply for a job. The defendant stated that when the two left, he started throwing things around the house and "messing it up." About 15 minutes later, at about 11:15 a.m., the defendant grabbed his children and drove to Luna Security, where he knew the victim and Flores would be. The defendant told Detective Dickinson that he went inside and brought the victim out with him, and that as he did so the victim told him that "he was nuts." The defendant and the victim got into the defendant's car, and the defendant proceeded to give the victim a driving lesson on their way home.

According to Detective Dickinson, the defendant stated that once they arrived home, the defendant apologized to the victim for "messing up the house" and told her that he would put the

11

two younger children to bed and give the older one a bath. The defendant told Detective Dickinson that at that point the victim ran into the bedroom, slammed the door and locked it. The defendant tried to pry the door open with a nail, but then heard a "loud pop" inside the bedroom, and so proceeded to kick the door in to gain access to the room. Once inside the bedroom, the defendant saw the victim lying on the bed, with her back against the wall bleeding, holding a gun in her hand. The defendant picked the victim up from the bed and started dragging her across the floor toward the front exit. The defendant noticed that the victim was still holding the gun, so he picked it up and threw it out of the window. The defendant told Detective Dickinson that once he reached the stairs he started yelling for help and that soon thereafter his father and brother[3] arrived, and his brother was sent to call the police.

On cross-examination, Detective Dickinson acknowledged that he did not audiotape, videotape, take notes of, or use a court reporter to transcribe the defendant's interview. Detective Dickinson also clarified that when the defendant stated that he was jealous of Flores, he stated that he was jealous because Flores had a job and he did not. In addition, Detective Dickinson agreed that the defendant told him nothing about Flores and the victim having an affair.

On cross-examination, Detective Dickinson identified a photograph of the defendant taken at the time of the interview and stated that the defendant's hands appeared dirty and smudged, and that his T-shirt did not appear to have a lot of blood on it.

Detective Robert Rutherford next testified that together with his partner Detective Kevin McDonald, at about 12:25 p.m. on September 8, 1997, he responded to a call of a shooting that

---

[3]As shall be described in further testimony below, the defendant's brother and father were next-door neighbors to the victim and the defendant.

had taken place at 1707 North Artesian Avenue. Detective Rutherford stated that once inside he observed the victim's body near the staircase of the front entrance, as well as a blood trail leading from the bedroom to the front entry way of the apartment. Detective Rutherford, however, observed no damage to the handles or the framing of the bedroom door. He further inspected the garbage cans behind the apartment building where the gun was found and noted that one of the garbage cans was right below a window to the victim's apartment.

Detective Rutherford next testified that later that afternoon, at about 3:15 p.m., he returned to Area 5 police station to interview the defendant. The defendant had already been tested for gunshot residue and was seated handcuffed inside the interview room. Detective Rutherford proceeded to Mirandize the defendant using the F.O.P. book, and the defendant indicated that he wished to speak to the detective.

The defendant gave the exact same statement to Detective Rutherford that he had previously given to Detective Dickinson. The defendant merely added that when he went to pick the victim up from Luna Security he borrowed his brother's truck. He further added that he was trying to drag the victim's body across the living room floor in order to take her to the hospital and that he picked up the gun she was holding in her hand at that time and threw it out of the window, which was across the room. Detective Rutherford testified that this window was about 15 to 20 feet away from where defendant must have been standing at that point while dragging the victim's body. The defendant also told Detective Rutherford that after his brother called the police, he went across the street to his cousin's house, where he waited for the police.

Over defense counsel's objection, Detective Rutherford next testified that he told the defendant that he did not believe him. Specifically Detective Rutherford pointed out two

13

discrepancies in the defendant's statement: (1) that there was no damage to the bedroom door although defendant had stated that he had broken it in, and (2) that it was physically impossible for the gun to have landed in the trash can in the place that it did, if it had been thrown out of the window from the middle of the living room floor.

Detective Rutherford, explained that he then left the interview room to permit the defendant to "think it over" and then returned at about 4:15 p.m. to reinterview him. According to Detective Rutherford, at this point the defendant provided a somewhat different version of events. The defendant told Detective Rutherford that he was opening the bedroom door with a nail when he heard a "loud bang" from the room. When Detective Rutherford told the defendant that he never saw a nail in the apartment, and asked him where the nail was, the defendant could not answer. The defendant also told Detective Rutherford that instead of throwing the gun out of the window from the center of the living room, as he previously stated, he picked up the gun, walked over to the window and dropped it down onto the garbage can, before returning to the victim and continuing to drag her to the front door.

Detective Rutherford testified that he again told the defendant that he did not believe him because the gun was found deep inside the garbage can and not lying on top of it as it would have been had it been thrown out of the window. Detective Rutherford again exited the interview room and returned at 6 p.m. to speak to the defendant for a third time. During this interview, the defendant provided yet another version of events. The defendant told Detective Rutherford that as he was putting the children to bed, the victim entered the bedroom and he saw her holding a cocked gun in her hand. The defendant went into the bedroom and began to struggle with the victim over the gun. During the struggle the barrel turned around and was pointed at the victim's

14

face, and then "it went off." The defendant told Detective Rutherford that he dropped the gun in the garbage can and dragged the body to the foot of the stairs, where he was met by his brother and his father. Detective Rutherford testified that he again told the defendant the he did not believe him. Detective Rutherford explained that he told the defendant that it would have been impossible for the defendant to twist the victim's hand so as to point the gun at her face because the gun had a 10-inch barrel.

When Detective Rutherford asked the defendant where he originally obtained this particular gun, the defendant stated that he found it behind some bushes in Reese Park. Detective Rutherford stated that he did not believe that the defendant found this gun at a park because "this was a very nice gun."

On cross-examination, Detective Rutherford admitted that he never made any notes of his three interviews of the defendant, that none of the interviews were audio or video taped or recorded by a court reporter, or made in the presence of a prosecutor. Detective Rutherford also admitted that he advised the defendant of his Miranda rights only at the beginning of his first interview and did not re-Mirandize him when he returned to the interview room on two subsequent occasions.

On cross-examination, Detective Rutherford identified a photograph of the defendant taken at the time of the interviews and stated that the defendant's hands appeared dirty and smudged and that he did not appear to have a lot of blood on him.

Detective Rutherford also admitted that although the police officers canvassed the area after the crime, they found no witness who reported having heard a struggle in the victim's apartment or having seen the defendant throwing the gun out of the window.

15

On redirect examination, Detective Rutherford was permitted to testify, over defense counsel's objection, that he did not believe that "the defendant ever told [him] the truth."

On redirect examination, Detective Rutherford testified that if the defendant had screamed inside the apartment, the defendant's cousin across the street would not have been able to hear it because the victim's apartment was in the rear of the building at 1707 North Artesian Avenue. Detective Rutherford also testified that aside from the defendant's family members, no witnesses were found who stated that they heard the defendant scream for help. Detective Rutherford also noted that although the defendant's family members stated that they heard the defendant calling for help, they all denied having heard the gunshot, which Detective Rutherford described as "very loud, rather like a cannon."

Over defense counsel's objection, Detective Rutherford next testified that it was his opinion that because upon the defendant's arrest, the defendant was handcuffed from behind and slid into and out of the police car, "the chances of detecting gunshot residue became remote." According to Detective Rutherford, "the gunshot residue could have been transferred every time the defendant touched something."

During redirect examination, Detective Rutherford also testified that in his many years as a detective he has come across many suicide scenes, but he has never come across one where the suicide weapon is missing, and he found this suspicious during the investigation.

On re-cross-examination, Detective Rutherford acknowledged that gunshot residue can be obtained not only from the defendant's hands but also from clothing he would have been wearing during the incident.

The parties next stipulated to the admissibility of the prior testimony of Chicago police

16

evidence technician and forensic investigator Robert Davie[4] at defendant's previous trial, and to the transcript of that testimony, which was then read to the jury. Davie testified that at about 12:15 p.m. on September 8, 1997, he processed the scene of the crime at 1707 North Artesian Avenue. Davie first proceeded the alley behind the residence, where he photographed the gun and removed it from the garbage can. Davie identified the gun as a newer model of a bluesteel .44 Magnum, Rugger brand with a ten-inch barrel, and inventoried it by using latex gloves to protect the gun from contamination and placing the gun in a sealed bag. Davie also unloaded the weapon and discovered a single-fire cartridge, which he then inventoried at the police crime lab.[5]

Davie next proceeded to the second floor of the residence where he observed the female victim lying face down in the exterior hall and what appeared to be drag marks leading from the bedroom to the hallway. Davie noted a large amount of blood in the bedroom and on the mattress, as well as a footprint on the mattress.

Davie finally testified that at about 1:59 p.m. on September 8, 1997, he performed a gunshot residue test on the victim and that he performed the same test on the defendant at approximately 3 p.m. that afternoon.

Robert Berk, a trace evidence analyst employed by the Illinois State Police crime lab, was qualified as an expert in gunshot residue analysis and testified that he analyzed the results of the gunshot residue tests performed on the defendant and the victim by Davie. Berk said that the victim's right hand tested negative for gunshot residue but that the victim's left hand tested

---

[4]Robert Davie was deceased at the time of defendant's present trial.

[5]The parties testified that the proper chain of custody was observed in transporting the weapon and the fired cartridge to the crime lab.

positive, indicating that she handled, fired, or was in close proximity to a weapon as it was being discharged. As to the tests performed on the defendant's hands, Berk testified that those tests were inconclusive. Specifically, with respect to the defendant's left hand, Berk stated that there were elevated levels on both the palm and the back of the hand, but "due to the elevated level of the barium to antimony ratio [he] was unable to associate those elevated levels with the gunshot residue, [and] as a result the samples from [the defendant's] left hand [we]re inconclusive." With regard to the test performed on the defendant's right hand, Berk stated that "[t]here [were] elevated levels that [were] not what [he] would consider a normal level of the elements for an individual in the general population. The levels [were] what [he] would *** refer to as elevated and significant." According to Berk, elevated and significant levels of these elements are present when a firearm is discharged, and therefore he could not rule out that the defendant had handled or discharged a firearm. He explained that the levels indicated either "the remnants of gunshot residue or simply some exposure to those elements from an environmental source."

Berk was next asked to explain the concept of gunshot residue transference and expounded that "any normal activity that an individual go[es] through with their hands would transfer the gunshot residue on their hands to those other surfaces." Berk specifically stated that transference would occur if one person grabbed the hand of another who had just discharged a firearm. Berk also stated that transference could occur if a person was handcuffed behind his back and slid into a squad car with his hands rested against the backseat, because "you would be losing the residue to both the back of the garment that you were wearing and also to the back of the squad car seat."

On cross-examination, Berk acknowledged that the analysis of gunshot residue permits

18

only three scientifically accepted results: (1) positive; (2) inconclusive; and (3) normal, and that the defendant's hands had both tested as "inconclusive." Berk further expounded that even testing positive for gunshot residue would not necessarily mean that a person fired a weapon, as it could also mean that the person merely handled the gun or was in close proximity to the gun when it was discharged.

On cross-examination, Berk acknowledged that as part of standard procedure at that time the lab did not test short-sleeved T-shirts for gunshot residue because such a shirt is not close enough to the hand which handles the firearm. Berk also admitted that there was no indication in this case that the defendant's hands had been washed prior to the performance of the gunshot residue test.

Illinois State Police forensic scientist Joseph C. Thibault, an expert in the area of firearms identification next testified that he received a bullet from the medical examiner that was recovered from the head of the victim, as well as the gun that was recovered at the scene of the crime. After testing the fired cartridge from the gun recovered at the scene of the crime and the bullet recovered from the victim's head, it was Thibault's opinion to a reasonable degree of scientific certainty that the gun recovered at the scene fired the bullet which killed the victim. Thibault also stated that the gun used in this case was particular because it had a very long, 10-inch barrel.

Illinois State Police forensic scientist Cynthia Engelking-Prus was next qualified as an expert in the area of forensic latent print examination, and she testified that she found no latent impressions on the gun retrieved at the scene of the crime that would have been suitable for comparison.

19

Dr. Nancy Jones, the chief medical examiner of Cook County, was next qualified as an expert in forensic pathology, and she testified that on September 9, 1997, she performed an autopsy of the victim's body. Dr. Jones testified that the victim was a 21-year-old female, 5 feet 3 inches tall and weighing 137 pounds.

Dr. Jones stated that the autopsy revealed a "near contact" or "soft contact" range gunshot wound just below the lower lip of the victim's mouth. The skin was charred or burned around the entrance wound and it was surrounded by gunpowder. Dr. Jones explained that a "near contact" or "close contact" wound is one where the gun "is just barely touching the body" and there is enough room for some of the gunpowder from the weapon to get deposited on the body around the entrance wound. Dr. Jones further testified that during her internal examination of the victim she recovered the bullet from inside of the victim's head, and determined that the bullet had entered through the lower lip with a slight left to right, upward trajectory.

Dr. Jones concluded to a reasonable degree of medical certainty that the victim died as a result of a gunshot wound to her face and that the manner of death was homicide. Dr. Jones explained that the manner of death is consistent with homicide rather than suicide because of the location and type of the entrance wound. Specifically, she stated that the this was a soft contact wound, "which means [that] the gun was not exactly in complete contact with the body [, which] is unusual, as suicides usually put the gun firmly on the skin." Dr. Jones contrasted this wound with wounds typical in homicide cases, stating "[i]n homicidal close range gunshot wounds *** or near contact wounds there is usually some evidence that the victim tried at least to pull away leaving that little gap between the entrance wound or where the skin is and where the end of the barrel of the gun is at." With respect to the location of the wound, Dr. Jones explained that

unlike the present wound, suicide wounds are often found on the right or left temple region or inside the mouth in the hard pallet. Although Dr. Jones acknowledged that she has come across "contact range gunshot wounds which are self-inflicted on the undersurface of the chin," she explained that those are usually "up in an area where the bullet can get to the brain itself or the brain stem."

Dr. Jones testified that in coming to her conclusion about the manner of the victim's death she reviewed all of the crime lab reports, the gunshot residue tests performed on the victim and the defendant, the 911 transcripts, and all of the crime scene photographs, and she stated that none of these documents altered her opinion that the death was a homicide.

Dr. Jones further acknowledged that after the defendant's second trial, she reviewed two more documents in order to determine whether they would change her conclusion with respect to the manner of death. The first document was an affidavit prepared in 2000 by Elizabeth Constable, the victim's friend, who was 16 years old in 1997. According to Elizabeth's affidavit, sometime in 1997, a few weeks before the incident, the victim told Elizabeth that she forced herself to throw up and that after disagreements with the defendant she did not care whether she lived or died. The record further reflects that according to Elizabeth at this time the victim did not appear concerned with her children and, in fact, told Elizabeth that "her family would take care of [them]." Dr. Jones stated that this affidavit did not change her opinion as to the manner of death, because there was nothing in the autopsy indicating that the victim was making herself throw up and, further, because the statement about not caring whether she lived or died expressed apathy rather than an intent to commit suicide.

Dr. Jones also reviewed the statements of Carol Gonzales, another one of the victim's

21

friends, who was interviewed by a State investigator subsequent to the defendant's first trial and who stated that the victim attempted to commit suicide after the birth of her first child. The record further reveals that Gonzales also told the investigator that "people in the church always picked on her [the victim]." Dr. Jones explained that these statements did not change her opinion as to the manner of death, because she was unclear as to their accuracy and because there was no evidence here of postpartum depression.

Dr. Jones finally concluded that based on all of the aforementioned information she was convinced "beyond a reasonable degree of medical certainty that this [was] a homicide and not a suicide."

On cross-examination, Dr. Jones admitted that she was neither a psychiatrist nor a psychologist and that it was impossible for her to determine from the autopsy how the victim was feeling, whether she was suffering from depression, postpartum depression, or an eating disorder, or whether she had attempted suicide four years prior to this incident after the birth of her first child.

On cross-examination, Dr. Jones admitted that a gun was the single most common choice of weapon for suicide among 19- to 24-year-old girls and that, when a gun is used, the most common choice of place to shoot was the head. Dr. Jones further acknowledged that she is unaware of any single published scientific study indicating that the only way to commit suicide is by placing the gun inside the mouth, on the temple or underneath the chin.

Dr. Jones further acknowledged that the inventory of the victim's clothing, which she received as part of the autopsy, did not reveal that the victim had a check for $55 on her person. Dr. Jones also acknowledged that during the autopsy she examined the victim's nails. She stated

that the victim had long artificial nails with a pattern on them, and none of the nails were either missing or chipped, or contained any residue or skin underneath them.

Dr. Jones also admitted that in coming to her conclusion that the manner of death was homicide she did not consider the following facts: (1) that the victim had been abandoned by her mother at birth, (2) that not too long prior to the incident the victim had arranged to meet her biological mother for the first time but that the mother called it off at the last minute; (3) that the victim had had three children in the past four years, (4) that at the time of the incident the victim was facing eviction, and (5) that at the time of the incident the victim was having an affair with Flores. Dr. Jones admitted that the victim's state of mind was "absolutely irrelevant to her" in coming to the conclusion that the manner of death was homicide.

On redirect examination Dr. Jones testified that none of the aforementioned factors would have changed her opinion because she routinely does not investigate a victim's state of mind in coming to her conclusion regarding the manner of death. Dr. Jones then again reiterated that based upon "the evidence on the body and the evidence at the scene" she was convinced "beyond a reasonable medical and scientific certainty" that this was a homicide and not a suicide.

B. Defendant's Case in Chief

After the State rested, the defendant moved for a directed verdict, which was denied by the trial court. The defendant then proceeded with his cause and first called his brother, Nicky Munoz (hereinafter Nicky) to testify on his behalf. Nicky testified that in September 1997 he lived with his parents at 1713 North Artesian Avenue. Nicky explained that there was a vacant lot between his residence and that of the defendant. Nicky stated that on the morning of September 8, 1997, he was inside the house, while his father was outside in the backyard with a

23

couple of friends doing cement work. At about 12:20 or 12:30 p.m., Nicky was inside the bathroom on the south end of the house right next to the vacant lot, and the window in the bathroom was open, when he heard the defendant yelling for help. Nicky ran outside and saw his brother leaning out of a hallway window in his apartment yelling for help. Nicky ran to the defendant's residence, and as he climbed up the stairs he saw the defendant holding the victim. The defendant kept saying "she shot herself," and then he placed the victim on the ground. Nicky then ran back to his house to telephone for help because the defendant did not own a phone. Nicky told the 911 dispatcher that the victim had shot herself.

On cross-examination, Nicky admitted that he did not hear the gunshot, and therefore could not state how much time elapsed between the gunshot and his brother's cries for help. On cross-examination, Nicky also admitted that when he testified at the defendant's previous trial on November 6, 2000, he never stated that when he climbed the stairs he saw the defendant carrying the victim, but rather had testified that "the victim [was] at the top of the steps and [the defendant was] just standing there *** just like frozen."

John Berrios, the defendant's cousin by marriage, testified that at the time of the incident he lived across the street from the defendant. At about 12:20 or 12:30 p.m. that day, Berrios was in front of his house, when he heard someone yelling for help from the building right across where the defendant and the victim lived. Berrios next observed the defendant's father and his brother Nicky running from their house toward the building, and so he ran after them. Berrios entered the building and was climbing up the stairs when Nicky pushed down past him. Berrios climbed up the stairs and saw the victim on the ground bleeding and the defendant in the living room, screaming, holding his head and saying "my baby shot herself, my baby, my baby."

24

Berrios stated that the defendant appeared to be in shock, so he picked him up and helped him down the stairs and across the street to his house. Berrios left the defendant and ran back to get the children. After the police arrived, Berrios escorted them to the defendant.

Berrios also testified that after the victim had her last child, about seven months prior to the incident, she seemed sad and depressed but did not want to tell anyone what she was sad about.

On cross-examination, Berrios admitted that he never heard a gunshot and therefore could not tell how much time elapsed between the gunshot and the commotion outside. Berrios also acknowledged that at the defendant's prior trial in November 2000, he did not indicate that he heard anyone yell for help, but merely that he heard "some loud yelling." Berrios also admitted that he never saw a gun in the apartment or the defendant throwing anything out of his window.

The defendant's father, Cesar Munoz (hereinafter Cesar), next testified that on the date of the incident, he lived with his wife and younger son, Nicky, at 1713 North Artesian Avenue. At about 12:30 p.m. Cesar was "doing some concrete work" in his backyard, when he heard someone screaming for help. Cesar first did not see who was screaming but then he looked over to the defendant's building and saw his son screaming "help me help me *** Maggie [the victim] shot herself." Cesar immediately jumped the fence to the empty lot and ran toward the defendant's building, where he ran into Nicky, and they climbed the stairs together. At the top of the stairs Cesar saw the victim lying on the ground and bleeding. Nicky then ran down to call for help and Cesar followed him.

Cesar also testified that prior to hearing the screams for help, he was standing in his alley with three men next to a cement truck, which was pouring concrete. He stated that the truck was

parked in the same alley where the defendant's garbage cans were located, approximately 25 feet away from him. Cesar averred that he never saw anyone next to the garbage cans that morning.

On cross-examination, Cesar admitted that he never heard a gunshot.

The defendant's mother, Aida Munoz (hereinafter Aida), next testified that after the birth of the victim's last child, about seven months prior to the incident, the victim had become distant and did not permit Aida into her house. Aida also testified that she had conversations with the victim regarding the victim's biological mother. Specifically, sometime in the summer of 1997, the victim indicated to Aida that she did not understand why her mother gave her up if she loved her. On another occasion, about two weeks prior to the incident, Aida remembered that the victim was very excited because she was finally going to travel to meet her biological mother and wanted to purchase nice clothing to impress her. According to Aida, however, the victim's mother canceled the visit at the last minute, and the victim became very distant, started losing a lot of weight and her "teeth [started] deteriorating."

On cross-examination, Aida acknowledged that the victim's weight loss occurred after her pregnancy so that it was not unusual. She also testified that she was not aware that the victim was having an affair with Flores or that Flores lived with the victim and her family. In addition, Aida admitted that she was not aware that the victim was unhappy with the defendant and wanted out of the relationship.

The defendant next took the stand in his own defense. The defendant testified that the met the victim in 1994 on the train to Rantoul, where both of them were going for a General Educational Development (GED) program. At that time, the victim already had a child with a man who was in prison. In January 1995, after graduating from the program and returning to

26

Chicago, the defendant and the victim moved in together into a studio owned by the defendant's family at 2452 West LeMoyne. While at this address, the victim and the defendant had two children of their own. The defendant testified that he and the victim moved out of the apartment and into 1707 North Artesian Avenue because they needed a larger apartment.

The defendant denied that he shot the victim. He also denied that he was aware that the victim and Flores were having an affair. According to the defendant, on the morning of September 8, 1997, he and the victim agreed that he was going to clean the place because they had a party the night before, while the victim was going to go with Flores to apply for a job. The victim went to a local pawn shop and pawned his watch to buy milk for the children then returned home and fell asleep. When he woke up, he heard the children playing and became upset with the victim because she had not taken the children to the babysitter.

The defendant testified that he then borrowed his brothers truck and took the children with him to Luna Security to speak with the victim. On the ride home to the apartment, the defendant gave the victim a driving lesson. Once at the apartment building, the two of them were met by Flores and another friend, who said they were going to buy cigarettes and then return. The defendant and the victim went upstairs to the apartment with their children.

The defendant next testified that once inside the apartment, the victim told him to put the younger children to bed, while she ran a bath for the oldest girl. As the defendant was helping the middle child into bed, he heard the victim run into the bedroom and a door slam. The defendant stated that he also heard the victim crying. The defendant stated that he stood in front of the bedroom door asking the victim "what's going on, *** open the door, what's going on, why are you crying." The defendant stated that the victim did not answer him and that he saw

27

her shadow moving across the room from underneath the door and that he then heard a drawer open. The defendant noticed a nail on the floor, and attempted to pry open the locked bedroom door, when he heard a loud pop. At that point the defendant just "burst through the door." The defendant testified that he saw the victim sitting on the bed, "throwing up blood." He stated that at that point he "just went crazy," and started screaming for help. The defendant ran to the window and continued to scream for help, and then he ran back to the bed and grabbed the victim and carried her out.

On cross-examination, the defendant admitted that during his prior trial in November 2000, he had testified that on September 7, 1997, he had a discussion with the victim about her desire to apply for a job at Luna Security and that he had asked her not to go to the job interview, but that she nevertheless went.

On cross-examination, the defendant denied that he owned the gun, stating that it belonged to Flores. He testified that the gun was kept in a drawer in his and the victim's bedroom and that it was kept there for "protection." The defendant also stated that there were bullets for the gun but that he did not know where they were and whether the gun was loaded. When asked whether the victim had ever handled the gun, the defendant stated that he was not aware that she had, but she had been curious about the gun.

The defendant admitted that on the morning in question he was angry at the victim for leaving him alone with the children and that he was still upset when they returned home from Luna Security.

When questioned about the scene of the crime on cross-examination, the defendant could not recall what he did with the nail that he used to open the door with. The defendant also could

28

not recall where the gun was once he burst in through the bedroom door. He testified, however, that he grabbed the victim underneath her armpits and carried her backwards out of the bedroom. The defendant later admitted that he dragged the victim facedown to the front door.

On cross-examination, the defendant also stated that once he put the victim's body on the ground by the front door, he returned to the bedroom, picked up the gun and threw it out of the window into the garbage can while his father was standing next to him yelling, "where is the gun, where is the gun." The defendant could not recall what the children were doing after the shooting, or whether they came out to see what was wrong.

The defendant denied having changed his story regarding the disposal of the gun in his conversations with Officer Rivera and Detective Rutherford. The defendant admitted, however, that he had lied to police and at his first trial, when he stated that the gun belonged to him and that he found it in Reese park, but he explained that he had done so because he "did not want to implicate anybody."

Dr. Shaku Teas was next qualified as an expert in forensic pathology and testified on behalf of the defendant. Dr. Teas admitted that she last worked for the Cook County medical examiner's office in 1991 and that since then she has been self-employed, appearing in trials as a forensic pathology expert. Dr. Teas acknowledged that she was being paid $325 per hour for her testimony in this case.

Dr. Teas stated that she did not perform an autopsy of the victim but that, instead, she reviewed the autopsy reports prepared by Dr. Jones, the autopsy photographs, the photographs of the scene of the crime, the police reports of the incident, and the transcripts of the prior proceedings in this case. Dr. Teas also testified that she reviewed three documents, which were

not initially reviewed by Dr. Jones when she made her original conclusion as to the manner of the victim's death, immediately after the autopsy, namely two affidavits by Nancy Constable[6] and Elizabeth Constable, and the interview of Carol Gonzales, which as discussed above, revealed that the victim had forced herself to throw up, did not care whether she lived or died, and attempted to commit suicide after the birth of her first child. After reviewing all of these documents, Dr. Teas concluded to a reasonable degree of scientific certainty that the manner of death was suicide, resulting from a self-inflicted gunshot wound.

Dr. Teas explained that her conclusion was based on the following method:

"Whenever you have a gunshot wound or actually any question where you have to decide besides whether this is a suicide or whether it is a homicide, the first thing you would consider [is]: Is the wound and the direction of the wound consistent with being self-inflicted [?]

Is this wound in a part that's accessible to the person and is [it] in the direction consistent with the person holding a gun in a certain way. And once you see that it is consistent with the person inflicting the wound themselves, then you need to consider ancillary information to see whether there is anything in the psychological make up of the person to say that the person would have inflicted this wound on themselves."

_____

[6]Dr. Teas explained that Nancy Constable is the mother of the victim's friend, Elizabeth Constable, and that her affidavit was consistent with that of her daughter. Specifically, Nancy Constable's affidavit stated that Elizabeth had told Nancy that "Maggie [the victim] had been losing weight and that she had said that she has ben throwing up, intentionally throwing up," and that "Maggie [the victim] told her [Elizabeth] that she did not care if she lived or died."

30

Dr. Teas testified that in this case, her review of the records from Dr. Jones' autopsy revealed that the location of the victim's wound was consistent with being self-inflicted because: (1) the location of the entrance of the wound (the victim's chin and lip) was "very accessible" to the victim; and (2) the direction of the wound (upward at an angle) was consistent with the victim holding the gun herself. She further stated that her conclusion that the wound was self-inflicted was corroborated by the fact that gunshot residue was found on the victim's hand, but not on the hand of the defendant.

Dr. Teas further testified that in coming to her conclusion, she next performed a so-called psychological autopsy, by considering ancillary information, namely the affidavits of the Constables and the interview of Gonzalez, to determine what the victim's state of mind was prior to her death. Dr. Teas explained that based on the aforementioned, she concluded that the victim had committed suicide because at the time of the incident she could have been suffering from bulimia and/or postpartum depression.

On cross-examination, Dr. Teas admitted that she is self-employed and that she specializes in exhumations or "second autopsies" and is hired by "[e]ither families or lawyers," but that she "occasionally do[es] coverage for *** coroners" as well.

Dr. Teas also acknowledged that the medical examiner's office of Cook County does not routinely perform psychological autopsies, but noted that there are other examiner's offices in other jurisdictions that do perform such autopsies by hiring a psychologist or psychiatrist to gather information about the victim to determine the victim's background and state of mind prior to death. Dr. Teas stated that, in her opinion, this case warranted such a psychological autopsy, but that unfortunately such an autopsy was never performed.

31

Dr. Teas conceded on cross-examination that she is not a psychiatrist and that she had concluded that it was possible that the victim had suffered from postpartum depression and bulimia based solely on the affidavits of Elizabeth and Nancy Constable and the interview of Carol Gonzales. Dr. Teas admitted, however, that the affidavits of Elizabeth and Nancy Constable were generated three years after the shooting and that they were prepared by defense counsel. She also admitted that in coming to her conclusion she did not interview or meet Elizabeth or Nancy Constable or Carol Gonzales.

### C. The State's Rebuttal

In rebuttal, the State first stipulated and defense counsel agreed that at a previous proceeding the defendant had testified under oath that at the time of the incident he weighed 250 pounds.

The State next recalled the victim's sister, Lizette Hidalgo, who testified that although the victim was adopted when she was six months old, she had always been raised and considered one of the family, and therefore never expressed sadness about being adopted. Hidalgo further testified that the victim loved her children and never attempted to commit suicide after the birth of her first child. According to Hidalgo, the victim was generally a happy person, but she was unhappy with her relationship with the defendant. Hidalgo stated that she was aware that the victim was having an affair with Flores and that she was happy with him.

The State then called Merce Lopez, another one of the victim's sisters, who similarly testified that the victim was six months old when she was adopted and never expressed any sadness about this. Lopez also testified that the victim had been a happy person prior to September 8, 1997, that she never attempted to commit suicide after the birth of her first child

32

and that Lopez had never observed any signs that the victim was making herself throw up.

Luce Rosario, the victim's adoptive mother, concurred that she adopted the victim when the victim was six months old and that her sister, the victim's biological mother, lived in Arlington, Pennsylvania. Rosario testified that she had always considered and treated the victim as her own child and that the victim never expressed sadness about being adopted. Rosario testified that the victim was a happy person and that she had never expressed suicidal thoughts.

The State also recalled Flores, who testified that there was no party at the victim's house on the night prior to the shooting and that the defendant therefore would have had no reason to clean the house on the morning of the incident.

### D. Verdict and Sentence

After rebuttal, the parties proceeded with closing arguments. After deliberations, the jury returned a verdict finding the defendant guilty of first-degree murder, and the defendant was subsequently sentenced to 45 years' imprisonment. The defendant now appeals.

### II. ANALYSIS

On appeal, the defendant argues that the trial court committed reversible error when: (1) it admitted into evidence hearsay statements made by the victim; (2) when it permitted two police officers (Detective Rivera and Detective Rutherford), neither of whom was qualified as an expert in gunshot residue testing, to testify about gunshot residue transference; (3) when it permitted the State's expert forensic pathologist, Dr. Jones, to invade the province of the jury by testifying that the manner of the victim's death was "homicide beyond a reasonable degree of medical certainty," and by opining as to the credibility of the defendant's statements to police that the victim's death was a suicide caused by depression; and (4) when it permitted Detective

33

Rutherford, who questioned the defendant immediately after his arrest, to testify as to the ultimate issue of the defendant's credibility. The defendant also argues that his conviction should be reversed because the prosecutor engaged in pervasive misconduct during closing argument, improperly shifting the burden of proof onto the defendant. Finally, the defendant challenges the sufficiency of the evidence used to convict him. We will address each of the defendant's contentions in turn.

A. Hearsay Statements Regarding the Defendant's Jealousy

The defendant's first contention on appeal is that the trial court erred when it permitted Flores, the victim's lover, to testify to certain hearsay statements made to him by the victim while she was alive. Specifically, the defendant points to the testimony of Flores that during his relationship with the victim, the victim told him that the defendant was "jealous of her" and that he "wanted to know where she was and what she was doing all the time." The State argues that these statements by Flores were properly admitted by the trial court under the state-of-mind hearsay exception. In the alternative, the State contends that even if admission of these statements was made in error, any such error would necessarily have been harmless. For the reasons that follow, we disagree with the State.

We begin with the well-settled principles regarding the inadmissibility of hearsay evidence and the relevant exceptions thereto. Hearsay evidence consists of "an out-of-court statement offered to prove the truth of the matter asserted" and "unless it falls within an exception to the hearsay rule," this type of evidence "is generally inadmissible due to its lack of reliability" and the inability of the opposing party to confront the declarant. People v. Caffey, 205 Ill. 2d 52, 88, 792 N.E.2d 1163, 1187 (2001), quoting People v. Olinger, 176 Ill. 2d 326,

34

357, 680 N.E.2d 321 (1997); see also People v. Dunmore, 389 Ill. App. 3d 1095, 1106, 906 N.E.2d 1233, 1244 (2009). Under the state-of-mind exception to the hearsay rule, a hearsay statement may be admissible if it "[expresses] the *declarant's* state of mind at the time of the utterance," *i.e.*, the declarant's intentions, plans or motivations at the time of the utterance. (Emphasis added.) People v. Lawler, 142 Ill. 2d 548, 559, 568 N.E.2d 895 (1991). Our supreme court has explained that any such state-of-mind utterances will be admissible only if: (1) the declarant is unavailable to testify, (2) there is a reasonable probability that the proffered hearsay statements are truthful, and (3) the statements are relevant to a material issue in the case. Caffey, 205 Ill. 2d at 91, 792 N.E.2d at 1189; see also People v. Floyd, 103 Ill. 2d 541, 546, 470 N.E.2d 293, 295 (1984).

A trial court's evidentiary rulings on hearsay testimony are reviewed under an abuse of discretion standard, and an abuse of discretion will be found only where the trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." Caffey, 205 Ill. 2d at 89, 792 N.E.2d at 1187.

In the present case, the record reveals that, over defense counsel's objection, the State's key witness, Flores, was permitted to testify that while she was alive, the victim had told him that she was tired of her relationship with the defendant, that she was unhappy with him and, more significantly, that the defendant was "jealous of her," and that he "wanted to know where she was and what she was doing all of the time." Even though defense counsel objected to this line of questioning, the prosecutor interjected explaining, "[the evidence] is not offered to show the truth ***. It's offer[ed] to show [the victim's] state of mind and the state of the relationship." The trial court agreed with the prosecutor and permitted Flores's testimony to stand.

35

Based on this record, the State argues that the trial court properly exercised its discretion in permitting Flores to testify regarding the victim's statements, because those statements fell well within the recognized state-of-mind exception to the hearsay rule. The State specifically contends that these statements met the three requirements necessary for their admissibility under the state-of-mind hearsay exception. First, the State contends that the declarant was unable to testify as she was dead. Second, the State asserts that the victim's statements must have been truthful because "she was discussing her feelings and concerns with someone she was involved with, a close and trusted friend." Finally, with respect to relevance, the State makes two arguments. The State first contends that because in its prior reversal of this case, this appellate court held that the victim's state of mind (*i.e.,* her possible suicidal tendencies) was a material issue in the case, any statements made by the victim which expressed the victim's mental impression at the time of the incident were relevant and admissible. Second, the State argues that these particular statements by the victim, that the defendant was jealous of her, indirectly express the victim's fear of the defendant, so as to negate the defendant's theory of suicide. For the reasons that follow, we disagree with the State.

The rule is clear that the state-of-mind exception applies only to a contemporaneous statement of the unavailable declarant and where such a statement by that unavailable declarant explains the state of mind of the declarant and not the state of mind of someone other than the declarant. See Lawler, 142 Ill. 2d at 559, 568 N.E.2d 895; see also People v. Cloutier, 178 Ill. 2d 141, 155, 687 N.E.2d 930, 936-37 (1997) (noting that the State misunderstood the state-of-mind hearsay exception because under that exception, "an out-of-court statement of a delcarant is admissible [only] when that statement tends to show the *declarant's* state of mind at the time of

36

the utterance" (emphasis in original)); see also 6 L. Pieczynski, Illinois Practice §23:67, at 402-03 (2d ed. 2005) (The state-of-mind hearsay exception "only applies to statements made by the declarant regarding his or her intention and not those of a third person").

Equally significant, and as already noted above, "in order to be admissible, the *declarant's* state of mind must be relevant to a material issue in the case." (Emphasis in original.) <u>Cloutier</u>, 178 Ill. 2d at 155, 687 N.E.2d at 936-37. Evidence is relevant if it has " 'any tendency to make the existence of any fact in consequence to the determination of the action more or less probable than it would be without the evidence.' " <u>People v. Coleman</u>, 347 Ill. App. 3d 266, 270 806 N.E.2d 1113, 1117-18 (2004), quoting <u>People v. Hope</u>, 168 Ill. 2d 1, 23, 658 N.E.2d 391 (1995). Evidence may be rejected as irrelevant "if it has little probative value due to its remoteness, uncertainty, or possibility of unfair prejudicial nature." <u>People v. Harvey</u>, 211 Ill. 2d 368, 392, 813 N.E.2d 181 (2004).

Under these well-settled principles, the victim's hearsay statements that the defendant "was jealous of her" and "wanted to know where she was and what she was doing all of the time" would not be admissible for the truth of their content. If anything, their admissibility would have to be premised upon each statement's revelation of the victim's state of mind, namely, the disclosure of her subjective impression that she considered her husband to be jealous of her. In no event, however, would the statements be admissible as evidence that the defendant was in fact jealous of her or that he wanted to know where she was all of the time, since that would be an admission of the statement for the truth of its content and, therefore, fully subject to the hearsay exclusion. <u>Caffey</u>, 205 Ill. 2d at 89, 792 N.E.2d at 1187; see also <u>Dunmore</u>, 389 Ill. App. 3d at 1106, 906 N.E.2d at 1244.

In order to justify such limited admissibility, the purpose for which the statements are admitted, namely, the victim's subjective impression that the defendant was jealous of her, would have to be relevant. Obviously, the risk that the trier of fact would not be able to make the substantive distinction between the victim's state of mind, *i.e.*, her subjective impression, and the actual fact described in her statements, could only be justified if the victim's state of mind would have fully independent relevancy to the issues in the case. Thus, we must confront the question to determine to what extent, if any, the victim's impression that her husband was jealous of her is probative of any material issues in this case. As shall be discussed below, we fail to find that any such relevancy exists.

We acknowledge that in our previous appellate court decision we held that the victim's declarations revealing her suicidal state of mind would have been admissible at the defendant's trial, since they were highly relevant to the determination as to whether the defendant committed suicide, which was a material and dispositive issue in the case. See People v. Munoz, 348 Ill. App. 3d 423, 810 N.E.2d 65 (2004). Those statements by the victim, which were relevant in establishing her suicidal motivations, included the proffered testimony by two of the victim's friends: (1) Elizabeth Constable, who would have testified that, about a month prior to the incident, the victim had told her that she "felt like killing herself" and that, about a week prior to her death, she indicated that "she was making herself vomit to lose weight" and stated that "she did not care if she lived or died" and (2) Carol Gonzales, who would state that in 1993 the victim told her that she had previously attempted suicide.

However, we find nothing in the victim's proffered hearsay statements regarding her impression that the defendant was "jealous of her" and "wanted to know where she was all the

time" that would have any independent relevance to the issues in this case. There is no basis upon which to presume that the victim's state of awareness of the defendant's jealousy would cause or discourage any suicidal inclinations. The only possible relevancy would be to establish motive on part of the defendant to kill her. As such, the sole function in admitting those hearsay statements would be to use the state-of-mind hearsay exception as a back door to convey the hearsay of the out-of-court declarant (the victim) to the jury for the truth of their patent content rather than as the basis of their latent content in establishing the victim's own state of mind. However, that is precisely why those statements are not admissible since any use of them to establish the defendant's motive would be a use to establish the truth of their content, which is exactly what the hearsay rules of exclusion are designed to avert. See Cloutier, 178 Ill. 2d at 154-56, 687 N.E.2d at 936-37; see also Harvey, 211 Ill. 2d at 392, 813 N.E.2d at 181.

This latter forbidden use was highlighted in the State's opening argument in which the prosecutor asserted that the defendant killed the victim in a fit of jealous rage, attributing to the defendant this motivation by stating:

> "[T]he defendant's nature was one of jealousy, was one of control. *** [The victim] needed to be where he could control her, where he could watch her. *** He [the defendant] couldn't sit there and watch his children for that short amount of time because of the jealousy and the rage. *** But when you're happy and you are with a jealous, controlling man, you are in danger."

As shall be discussed in more detail below, the defendant's jealous rage has no other source on the record other than the hearsay statements of Flores.

The State, nevertheless, cites to Floyd, 103 Ill. 2d at 546, 470 N.E.2d at 295, contending

that it was proper for the circuit court to admit the victim's statements that the defendant "was jealous of her" and "wanted to know where she was all of the time," because those statements reflected on the victim's fear of the defendant, so as to negate any possibility of a suicide. The State contends that Floyd stands for the proposition that a victim's statements of fear of the defendant may be used to rebut the defendant's theory that the victim did not die as a result of a homicide. We disagree, and find that the State misinterprets Floyd, 103 Ill. 2d at 546, 470 N.E.2d at 295.

In Floyd, the defendant was charged with the murder of his wife, who had died by drowning, in a nearby creek. Floyd, 103 Ill. 2d at 543, 470 N.E.2d at 294. At trial, the defendant argued that the victim had died as a result of an accident and objected to the introduction of statements that the victim had made to several witnesses prior to her death indicating that she was afraid of the defendant. Floyd, 103 Ill. 2d at 544-45, 470 N.E.2d at 294-95. These statements included, among other things: (1) the victim telling her father-in-law that she had given her two children his telephone number "and said if anything happened to her, would [he] come and get the children at once," (2) the victim telling her divorce attorney that there was "the possibility of physical violence" and that he then advised her to contact the sheriff to prepare him in the event that she needed to call him about such violence; and (3) the victim telling her 15-year-old daughter that she was concerned for her own safety and instructing her that if "there was trouble or something," that the daughter call her grandparents. Floyd, 103 Ill. 2d at 544-45, 470 N.E.2d at 294-95. The circuit court permitted these statements by the victim into evidence under the state-of-mind hearsay exception, and the appellate court reversed. Floyd, 103 Ill. 2d at 546, 470 N.E.2d at 295.

40

In affirming the decision of the appellate court, our supreme court in <u>Floyd</u> held that the statements by the victim that she feared the defendant were inadmissible as her state of mind of fear was irrelevant to any material issue at trial and served no independent purpose other than to create the inference that the victim's fear was in fact caused by threats and other intimidating conduct by the defendant, and that the defendant was guilty of murder. <u>Floyd</u>, 103 Ill. 2d at 546, 470 N.E.2d at 295. Specifically, our supreme court held that the victim's statements expressing her fear of the defendant were irrelevant because they did not increase or decrease the likelihood that the victim acted in a manner relevant to establishing that her death, *i.e.*, the drowning in the creek, was not a result of an accident. <u>Floyd</u>, 103 Ill. 2d at 548, 470 N.E.2d at 296. As our supreme court noted "the evidence [presented at the defendant's trial] showed that the deceased voluntarily accompanied the defendant on the evening of her death and that they had spent the evening drinking and dancing." <u>Floyd</u>, 103 Ill. 2d at 547, 470 N.E.2d at 295.

Although the State is correct that our supreme court in <u>Floyd</u> acknowledged that "evidence of the state of mind of the deceased may be relevant when it serves to rebut the defense of accident," <u>Floyd</u> makes clear that evidence of the declarant's fearful state of mind may not be used to show, by inference or otherwise, that the defendant acted in a manner to warrant the declarant's fear but that instead it may be used only to show that the declarant herself was feeling or manifesting that fear. <u>Floyd</u>, 103 Ill. 2d at 547, 470 N.E.2d at 295. Moreover, <u>Floyd</u> holds that the declarant's statements evidencing her state of fear will be relevant if that state of mind in and of itself would be probative in showing that it caused the declarant to act in a manner that would make death by accident less probable. <u>Floyd</u>, 103 Ill. 2d at 546, 470 N.E.2d at 295.

41

In the present case, even if the State is correct in its assertion that the victim's statements that the "defendant was jealous of her" and that he always "wanted to know where she was" could be interpreted as a basis from which to infer that her state of mind was fear of the defendant, as noted above, that state of mind (*i.e.*, her fear) would be irrelevant in determining whether she possessed a suicidal motivation. We fail to see how the victim's fear of the defendant could sufficiently increase or decrease the likelihood that she could take her own life, nor does the State assist us in reaching any such conclusion. Any such speculation must be weighed against the likelihood that the jury will have difficulty focusing and retaining only the indications of the victim's state of mind while rejecting and discarding the factual content of the statements from which her state of mind could be inferred. This is particularly true here, where there was no evidence presented at trial that as a result of this alleged fear the victim was forward looking rather than suicidal, and that she intended to pursue her relationship with Flores, so as to in any way decrease the likelihood that she may have taken her own life. In fact, Flores testified at trial that he and the victim had no intention whatsoever of revealing their affair or leaving the defendant's household to pursue their relationship on their own.

Accordingly, we find that the admission of Flores' testimony regarding the victim's statements that the defendant was jealous of her was made in error. See, *e.g.,* Lawler, 142 Ill. 2d at 559, 568 N.E.2d 895 (holding that a telephone conversation between the alleged victim of an aggravated criminal sexual assault and her father, which took place while the defendant was nearby could not be admitted under the exception to the hearsay rule for statements indicating declarant's state of mind to show that the defendant had a gun and that the victim could not get away); Cloutier, 178 Ill. 2d at 154-56, 687 N.E.2d at 936-37 (holding that a detective's

42

testimony about conversations in which several victims described how they were attacked by the defendant was not admissible in a death-penalty-eligibility phase of capital sentencing hearing under the state-of-mind hearsay exception because the declarants' states of mind when they spoke with the detective had no bearing on the defendant's state of mind when he killed the victim); see also People v. Davis, 254 Ill. App. 3d 651, 626 N.E.2d 1187, (1993) (holding that state-of-mind hearsay exception did not apply to hearsay testimony of the defendant's mother, who stated that the defendant told her that he carried a gun for protection because he was previously struck on the head and severely injured, since this statement was clearly irrelevant to any material issue at trial, the dominant one of which was whether the defendant was responsible for the victim's death).

The State nevertheless contends that even if the victim's statements were introduced in error, any such error would necessarily be harmless. We disagree.

Our supreme court has held that erroneous admission of hearsay evidence will be considered harmless only " 'where there is no reasonable probability that the jury would have acquitted the defendant absent the hearsay testimony.' " People v. Sims, 192 Ill. 2d 592, 628-29, 736 N.E.2d 1048 (2000), quoting People v. Nevitt, 135 Ill.2d 423, 447, 553 N.E.2d 368 (1990).

In the present case, the State has failed to establish that the improperly admitted evidence did not contribute to the defendant's conviction, as the evidence in this case was relatively closely balanced. Specifically, the record below reveals that there were no eyewitnesses to this shooting, that no prints were found on the gun that were suitable for comparison, that the victim's hand, rather than that of the defendant, tested positive for gunshot residue, and that the victim's wound was a close-range contact wound, indicating the possibility that it was self-

inflicted. In addition, the State failed to provide a single witness who would testify that he or she heard any argument, or fight coming from the victim's apartment. Moreover, in our earlier Munoz decision, we noted that the closely balanced nature of the evidence presented at the defendant's trial was apparent from the fact that this case has been tried more than once, with the first trial resulting in a mistrial as a result of the jury's inability to reach a verdict. Munoz, 348 Ill. App. 3d at 439, 810 N.E.2d at 78.

More overridingly, the prejudice to the defendant resulting from the improper admission of the evidence is plain since, as already noted above, the hearsay imputed to the defendant a motive to commit the crime. As previously noted, no other evidence whatsoever was offered at trial to suggest that the defendant was in fact jealous of the victim, or to establish that the defendant had a motive to kill her. In fact, although it was undisputed at trial that the victim and Flores engaged in a secret, romantic love affair, while the victim shared an apartment with the defendant, Flores and her children, the State presented no evidence whatsoever to establish that the defendant knew of this affair. Flores himself testified that to his knowledge the defendant never became aware of the affair, since he and the victim took pains to hide it. Even Detective Rutherford, who interviewed the defendant on the night of the incident, admitted that during his interview, the defendant never mentioned or indicated to him in any way that he was aware of the affair between the victim and Flores. Yet, as already noted above, in opening argument the prosecutor made it a point to argue that the defendant's motive in killing the victim was his jealousy. Accordingly, the hearsay statements offered by Flores' testimony were not cumulative of any other properly admitted evidence, but provided the State with the requisite evidence of motive necessary to convict the defendant, thereby clearly contributing to the defendant's

44

conviction. See, *e.g.,* Lawler, 142 Ill. 2d at 559, 568 N.E.2d 895 (holding that telephone conversation of alleged victim of aggravated criminal sexual assault with her father that took place while defendant was nearby could not be admitted under exception to hearsay rule for statements indicating declarant's state of mind where the prosecution did not use the conversation solely to evidence the victim's state of mind concerning whether she consented to intercourse but, rather, specifically used the conversation as substantive evidence that defendant had a gun and that the victim could not get away).  As such, we conclude that the improper admission of these statements was prejudicial and requires reversal.

B.  Detective Rutherford's Testimony Regarding the Defendant's Credibility

We further note that the defendant's conviction is reversible on the following independent ground.  As previously noted, during direct examination, Detective Rutherford testified that on the night of the incident he spoke to the defendant three times and that each time he informed the defendant that he "did not believe" his version of events because of certain discrepancies in the defendant's account.  Detective Rutherford also testified that throughout that night, the defendant continued to change his story, providing him with a slightly different version of events during each of the three interviews.  On redirect examination, Detective Rutherford finally testified that he did not believe that "the defendant ever told [him] the truth" that night.

The defendant contends that the admission of the aforementioned testimony was made in error as that testimony usurped the province of the jury on the ultimate issue of the defendant's credibility.  The State concedes that under Illinois law a witness is not permitted to comment on the veracity of another witness' credibility (People v. Kokoraleis, 132 Ill. 2d 235, 264, 547 N.E.2d 202, 264 (1989)), but nevertheless contends that, here, Detective Rutherford did not

45

comment on the veracity of the defendant but, rather, quite permissibly, explained his investigating procedure. For the reasons that follow, we disagree with the State.

We first note, and the defendant acknowledges that he has not properly preserved this issue for review by failing to raise it in his motion for a new trial. People v. Enoch, 122 Ill. 2d 176, 190, 522 N.E.2d 1124, 1131-32 (1988). Defendant nevertheless argues that we should review this issue under the plain error analysis. People v. Herron, 215 Ill. 2d 167, 178-80, 830 N.E.2d 467, 475-76 (2005). The plain error doctrine permits a reviewing court to bypass normal forfeiture principles and consider unpreserved error under two circumstances: (1) where the evidence in a case is so closely balanced that the error threatened to tip the scales of justice against him (*i.e.*, the jury's guilty verdict may have resulted from the error and not the evidence) and (2) where the error is so serious that it affected a defendant's substantial rights, and thus a fair trial. Herron, 215 Ill. 2d at 178-79, 830 N.E.2d at 475-76.

Since we have already found above that the evidence in this case was closely balanced, we may and will review the issue under the plain error doctrine. See Herron, 215 Ill. 2d at 178-80, 830 N.E.2d at 475-76. We proceed therefore by considering whether Detective Rutherford's testimony was admitted in error.

In that respect we first acknowledge that in Illinois a police officer may recount the steps taken in the investigation of a crime, and that he may describe the events leading up to a defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact. People v. Simms, 143 Ill. 2d 154, 174, 572 N.E.2d 947, 954-44 (1991); see also People v. Williams, 233 Ill. App. 3d 1005, 1016-17, 599 N.E.2d 1033, 1040-41 (1992). We note, however, that contrary to the State's assertion, the record below firmly establishes that

46

during redirect examination, Detective Rutherford went far beyond merely describing the steps he took in the investigation of this crime. As the transcript of the trial proceedings, reveals, during redirect examination, the following colloquy took place between Detective Rutherford and the Assistant State's Attorney:

"Q. [ASSISTANT STATE'S ATTORNEY:] And let me ask something, he never did tell you the truth in your mind, did he?

A. [Detective Rutherford:] No, sir.

[DEFENSE COUNSEL:] Objection, the officer's mind is irrelevant.

[ASSISTANT STATE'S ATTORNEY:] Well, we just probed his–

THE COURT: Sustained, go on.

Q. [ASSISTANT STATE'S ATTORNEY:] In your mind he never told you the truth, did he?

DEFENSE COUNSEL: Same objection.

THE COURT: He can answer.

A. [Detective Rutherford:] No sir."

This testimony followed two earlier statements made by Detective Rutherford during direct examination, indicating that he did not "believe" the defendant's first two versions of the incident. Even though it could be argued that the first two statements by Detective Rutherford explained the sequential logic of his investigation (*i.e.*, the detective pointing out to the defendant the discrepancies in each of the defendant's version of the events, then leaving the interview room to permit the defendant to "think it over," before returning to the interview room

47

to question him again), that reason cannot apply to Detective Rutherford's last statement, that he simply did not believe that the defendant ever told him the truth that night. This statement no longer points to a sequential account of the interview process and would therefore have no apparent purpose other than to invade the province of the jury and tell them who to believe. We especially find this statement by Detective Rutherford troubling because it was not made *sua sponte* but was rather specifically elicited by the prosecutor, who, despite defense counsel's objection, continued to repeatedly ask the detective on redirect examination, "he never told you the truth, did he?"

Accordingly, since the admission of this testimony served no other purpose but to impermissibly comment on the ultimate issue of the defendant's credibility, we find that it was made in error. See, *e.g.,* People v. Crump, 319 Ill. App. 3d 538, 542-43, 745 N.E.2d 692, 696-97 (2001) (holding that a police officer's affirmative response as lay witness to prosecutor's question concerning whether, during the course of his investigation, the officer had reason to believe that the defendant committed the offense, was inadmissible because the question usurped the province of the jury and asked for the officer to comment on the ultimate disputed fact in the case); see also People v. Hooker, 253 Ill. App. 3d 1075, 1088-90, 625 N.E.2d 1081, 1092-93 (1993) (holding that it was improper to permit a police detective to testify as to his belief that a defendant was guilty, as this pertained to the ultimate issue of fact; specifically holding that the following testimony should not have been admitted: the detective's statement that at a certain point during his interview of the defendant he realized that the defendant was "being deceptive," and later that this was "the point when [the detective] was sure that-that [the defendant] was –that [the defendant] was guilty of what the allegations were").

48

The prejudice stemming from this error is obvious given the relatively closely balanced nature of the evidence presented at trial and the fact that the ultimate issue in this case concerned the believability of the State's versus the defendant's version of events of the night in question, *i.e.*, whether the defendant was telling the truth when he claimed that on the date in question the victim committed suicide. Consequently, permitting Detective Rutherford to testify that "he never believed that the defendant told him the truth" on the night in question essentially translates into him instructing the jury not to believe the defendant. This is particularly true where Detective Rutherford is a police officer, and therefore a "figure of authority," whose testimony the jury likely would have credited with more weight. See Crump, 319 Ill. App. 3d at 542-43, 745 N.E.2d at 696-97 (holding that a police officer's testimony that he had reason to believe that "the defendant committed the offense" was especially prejudicial because as a "figure of authority" he was informing the jury that it should believe a portion of the prosecution's case). Accordingly, for all of the aforementioned reasons, we find that the erroneous admission of Detective Rutherford's testimony alone, as well as cumulatively, prejudiced the outcome of the defendant's trial.

C. The State's Pathologist's Attempt to Invade the Province of the Jury

Since the aforementioned errors alone are sufficient to require a reversal, we need not determine the remainder of the defendant's contentions of error on appeal. We do, however, briefly dwell on one last contention as it may guide the conduct of the parties on retrial. Specifically, we address the defendant's argument that the State's expert forensic pathologist, Dr. Jones, improperly and prejudicially invaded the province of the jury by testifying that her conclusion that the manner of death was a homicide was reached "beyond a reasonable degree of

49

medical certainty."

We previously reversed the defendant's second trial for the reason, among others, that in rendering her opinion as to the manner of death being homicide, the pathologist used the terminology of the legal standard "beyond a reasonable doubt" thereby invading the province of the jury as to the ultimate issue of the defendant's guilt.  See Munoz, 348 Ill. App. 3d at 440, 810 N.E.2d at 79.  While the term "beyond a reasonable degree of medical and scientific certainty" is not identical to the phrase "beyond a reasonable doubt" it echoes the legal standard which the expert pathologist was clearly prohibited from using.  See Munoz, 348 Ill. App. 3d at 440, 810 N.E.2d at 79, citing LID Associates v. Dolan, 324 Ill. App. 3d 1047, 1058, 756 N.E.2d 866, 876-77 (2001), and Sohaey v. Van Cura, 240 Ill. App. 3d 266, 283-84, 607 N.E.2d 253, 267 (1992).  The defendant cites to a litany of cases that show that the expert was required to render his opinion within "a reasonable degree of scientific certainty" (see, *e.g.*, People v. Williams, 209 Ill. App. 3d 709, 721-22, 568 N.E.2d 388, 395 (1991); Baird v. Adeli, 214 Ill. App. 3d 47, 65, 573 N.E.2d 279, 290 (1991); Knauerhaze v. Nelson, 361 Ill. App. 3d 538, 549, 836 N.E.2d 640 (2005)).  However, these cases use the standard of "reasonable scientific certainty" as a floor, not a ceiling.  The defendant fails to cite any case indicating that this standard could not be exceeded so as to prohibit any opinion to be given beyond a reasonable degree of scientific certainty.  On the other hand, the State likewise provides us with no authority to show that an expert could venture an opinion beyond a reasonable degree of scientific certainty.  In light of the fact that the description of certainty attested by the pathologist in this cases uses language that is suggestive of the legal standard "beyond a reasonable doubt" and in view of the fact that we reversed the defendant's earlier conviction on the basis that the use of this legal standard improperly invaded

50

the province of the jury, we would suggest that it is best that this terminology be avoided on retrial. However, we make no ultimate determination at this time as to that issue.

## III. CONCLUSION

Accordingly, for all of the reasons set forth above, we find that the aforementioned errors individually, as well as cumulatively, prejudiced the defendant's proceedings so as to require reversal for a new trial. We therefore reverse and remand for a new trial.

Reversed and remanded.

CAHILL, P.J., and ROBERT E. GORDON, J., concur.

Please use the following form

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

CESAR MUNOZ

Defendant-Appellant.

Docket No.

COURT

Opinion Filed

No. 1-08-0645

Appellate Court of Illinois
First District, SIXTH Division

February 11, 2010
(Give month, day and year)

JUSTICE JOSEPH GORDON DELIVERED THE OPINION OF THE COURT:

JUSTICES

JUSTICES CAHILL and ROBERT E. GORDON, concur.

APPEAL from the Circuit Court of Cook County; the Hon___ Judge Presiding.

Lower Court and Trial Judge(s) in form indicated in margin:

Appeal from the Circuit Court of Cook County;

The Hon. Marcus R. Salone Judge presiding.

APPELLANTS
John Doe, of Chicago

For APPELLEES,  :

Smith and Smith of Chicago,

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel.  Indicate the word FOR NONE if not represented.

FOR APPELLANT:  Kathleen T. Zellner, Douglas H. Johnson and Nicholas M. Curran, Kathleen T. Zellner & Associates, 2215 N. York Road, Suite 504, Oakbrook, IL 60523; telephone: (630) 955-1212

APPELLEE: Anita Alvarez, State's Attorney, James E. Fitzgerald, Alan J. Spellberg, and Matthew Connors, Assistant States Attorneys, Office of the Illinois State's Attorney, Cook County, Richard J. Daley Center, Room 309, Chicago IL 60602

Add attorneys for third-party appellants and/or appellees.