2022 IL App (1st) 192472
No. 1-19-2472
Opinion filed September 19, 2022

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 13 CR 9408 |
| | ) | |
| FRANK BUSCHAUER, | ) | The Honorable |
| | ) | Joseph Michael Cataldo, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Pucinski and Walker concurred in the judgment and opinion.

**OPINION**

¶ 1        In early 2000, Frank Buschauer called 911 after finding his wife, Cynthia Hrisco, unresponsive in the bathtub in their master bedroom. After an investigation that included hours questioning Buschauer, the case went cold. Buschauer and his young son moved to Wisconsin. More than a decade later, police reopened their investigation and interviewed Buschauer again. South Barrington police officers went to Wisconsin with a criminal complaint and warrant for Buschauer's arrest. When they met Buschauer, they did not execute the warrant or tell Buschauer they had it; instead, they asked Buschauer to accompany them to a local police station for an

interview. Buschauer complied, received *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), and spoke with detectives for hours before invoking his right to counsel. The State eventually charged Buschauer with first degree murder, and after a bench trial, the court found him guilty and sentenced him to 25 years' imprisonment.

¶ 2        Buschauer now raises two categories of arguments challenging his conviction. In the first, he makes a battery of constitutional challenges, invoking both the United States and Illinois Constitutions, to argue the trial court should have barred the statements he made in 2013 to South Barrington police. He also raises evidentiary and constitutional challenges to testimony from three of Hrisco's friends, who all provided statements from Hrisco that she made to them.

¶ 3        We affirm. The trial court correctly admitted Buschauer's 2013 statements to police because the officers' decision to withhold information about Buschauer's arrest warrant did not affect the validity of his *Miranda* waiver or make the circumstances of the 2013 interrogation fundamentally unfair. As to Buschauer's claims about Hrisco's statements to her friends, we find that they were primarily nonhearsay and nontestimonial. The trial court committed neither evidentiary nor constitutional error in admitting them.

¶ 4                                          Background

¶ 5        This court reviewed Buschauer's case in 2016 to decide whether statements to police in March 2000 were admissible. For an in-depth review of the facts, consult *People v. Buschauer*, 2016 IL App (1st) 142766. Here, we focus on the facts applicable to this appeal.

¶ 6        At 2:25 a.m. on February 28, 2000, South Barrington police officer Bryant Haniszewski responded to Buschauer's 911 call. He met Buschauer at the front door of his home. Buschauer said his wife drowned in the bathtub and took Haniszewski to the second-floor master bathroom. Haniszewski saw Hrisco's body on the floor next to the still-filled and running whirlpool tub.

Haniszewski touched her body; she felt hot. Buschauer told Haniszewski that, when he first went into the bathroom, he could not see Hrisco in the foamy water. So, he reached into the water, felt her body, and pulled her to the floor. Haniszewski thought this odd; Buschauer's clothes appeared dry, and nothing had been disturbed on the bathtub ledge, including a plant and glass containers.

¶ 7    The next day, Detective Daniel Kaepplinger of the South Barrington Police Department interviewed Deborah Kram, a friend of Hrisco's. Kram said Hrisco had confided that she and Buschauer had been having marital problems for two years concerning the construction of their house. Buschauer's cousin did the work, and Hrisco objected to the quality and thought the cousin overcharged them by as much as $200,000. When the couple talked about the house, Buschauer would "blow up." Hrisco described him as a "Jekyll and Hyde and would go off" on her. Once, he grabbed her neck and threatened to kill her if she tried to pursue her complaints against his cousin and said he regretted marrying her. Just four days before she died, Hrisco told Kram she feared Buschauer.

¶ 8    On March 4, South Barrington police officer James Kaplan interviewed Cheryl Kolweier, another of Hrisco's friends. Hrisco had told Kolweier about marital difficulties, including an incident the previous fall in which the couple argued about the house. Hrisco said Buschauer grabbed her by the shoulders, shook her, and said he "would kill her" if she continued pressuring his cousin.

¶ 9    Kaplan and fellow South Barrington police officer Mark Eaton interviewed Dr. Nancy Jones at the Cook County Medical Examiner's office. Dr. Jones had reviewed the results of Hrisco's autopsy. Dr. Jones opined that Hrisco's injuries conflicted with an accidental drowning. A hemorrhage in her neck occurred at or near the time of death, indicating either strangulation or getting hit with a blunt object. Hrisco also had petechial hemorrhaging under the scalp, a finding

more like asphyxiation than drowning. And she had a pooling of blood due to congestion of blood vessels (known as "lividity"), indicating she would have been faced down at death. Dr. Jones described the death as "very suspicious."

¶ 10                                      *March 2000 Interview and Search*

¶ 11          On March 6, 2000, Buschauer voluntarily drove to the South Barrington police station. Because the South Barrington police station lacked adequate facilities for an interview, Detective Kaepplinger took Buschauer to the Hoffman Estates police station. Buschauer sat in the front passenger seat with the doors unlocked. When they arrived, Buschauer was alone in the lobby for several minutes while Kaepplinger located Illinois State Police special agents Cindy Tencza and Peter Zeman.

¶ 12          Tencza and Zeman interviewed Buschauer in an unlocked interview room for over 13 hours, taking several short breaks, including lunch and dinner. During the morning, Buschauer told Tencza and Zeman that Hrisco went upstairs for a bath around 9 p.m. A half-hour later, he went to bed. Although the bathroom door was closed, he heard the whirlpool and Hrisco get into the tub. He fell asleep until 2:30 a.m., awakened by his infant son's cries. The whirlpool was still running, so he went into the bathroom. At first, he did not see her due to "foamy" water. Then, he reached under the water and felt Hrisco's body facedown. He pulled her out, placed her facedown on the floor, and called 911.

¶ 13          After a break in the interview at 10:35 a.m., Buschauer told the investigators he and Hrisco recently had been arguing about the cost of building their home and structural problems they discovered. Buschauer also said he found Hrisco faceup yet, a short time later, again said she was facedown. He could not explain why the objects around the tub remained undisturbed when he pulled her out.

¶ 14 After a lunch break, the interview resumed at 12:30 p.m. Zeman advised Buschauer of his *Miranda* rights from a preprinted form. Buschauer signed a waiver, indicating he understood his rights. Buschauer stated that he could have killed Hrisco but had no memory of so doing. He offered to take a "truth serum" and a polygraph test.

¶ 15 Buschauer signed a voluntary consent to search his home. South Barrington police searched the kitchen, dining room, first-floor office, and master bedroom. The officers seized two handwritten letters on the kitchen counter and recovered seven pages from the desktop computer. The interview concluded at 10:30 p.m.; Buschauer promised to return the next morning.

¶ 16 Buschauer, accompanied by his sister, returned to the Hoffman Estates police station the following morning. He told Tencza and Zeman he would not speak with them without counsel present.

¶ 17 A few months after Hrisco's death, the investigation went cold.

¶ 18 *April 2013 Arrest*

¶ 19 The South Barrington police department reopened the case in 2010. By this time, Buschauer and his son lived in Lake Geneva, Wisconsin. In July 2011, during an "ongoing death investigation," the department removed the whirlpool bathtub from the home.

¶ 20 On April 23, 2013, Haniszewski obtained an arrest warrant for Buschauer. The next morning, Haniszewski traveled to Walworth County, Wisconsin, and met the state's attorney's investigator, Bob Riordon. Haniszewski and Riordon located Buschauer at the local YMCA, where they knew Buschauer would be exercising. They introduced themselves and said they wanted to talk to him about Hrisco's death. Buschauer said he "always wanted to find out what happened" and agreed to answer their questions. Buschauer voluntarily got into the back seat of Haniszewski's car and rode unhandcuffed to the Walworth County Sheriff's Office.

¶ 21      Once there, Buschauer was brought to an interview room. Riordon read his *Miranda* rights from a preprinted form, and Buschauer said he understood his rights and signed a *Miranda* waiver. At this point, the arrest warrant against Buschauer had not been executed, but Haniszewski testified that he did not consider Buschauer free to leave.

¶ 22      Buschauer answered Haniszewski's and Riordon's questions for almost three hours. The interview was recorded. Buschauer told them about his tumultuous relationship with Hrisco and the issues between them. Buschauer admitted their arguments sometimes became violent, and he once got so angry he shook Hrisco and told her he could kill her. Buschauer also said it was possible he killed her without remembering it.

¶ 23      Around 11:17 a.m., Haniszewski and Riordon left Buschauer alone in the unlocked interview room. Buschauer was brought lunch and allowed to use the restroom. At 1:37 p.m., Haniszewski and Riordon returned and, again, read his *Miranda* rights. This time, however, the conversation between Buschauer and the police lasted 13 minutes before Buschauer invoked his rights. He refused to continue without a lawyer. Haniszewski and Riordon immediately concluded the interview and left the room. Around 2 p.m., Detective Troy Pagenkopf officially executed the arrest warrant and placed Buschauer under arrest for Hrisco's murder.

¶ 24      *Pretrial Motions*

¶ 25      In anticipation of trial, Buschauer moved to suppress three pieces of evidence: (i) statements he made to the Illinois State Police on March 6, 2000, (ii) the letters and other evidence seized from his home on March 6, 2000, and (iii) statements he made during the April 2013 police interview. The trial court granted his motion to suppress these statements and evidence but determined Buschauer's statements from 2013 would be admitted. The State appealed the trial court's ruling

regarding the statements and evidence from March 2000 as erroneous as a matter of law. We reversed the trial court's ruling. *Buschauer*, 2016 IL App (1st) 142766.

¶ 26    Buschauer later moved to prevent the State from introducing "voice from the grave" statements from Hrisco. He claimed that statements Hrisco made to her friends about Buschauer and statements Hrisco's friends made to police officers concerning his behavior before her death constituted inadmissible hearsay. In response, the State argued these statements established motive. The trial court admitted these statements at trial, but only for showing motive.

¶ 27    *Trial Testimony*

¶ 28    At trial, several medical experts and three of Hrisco's friends testified. These witnesses established the nature of Hrisco and Buschauer's relationship, the injuries Hrisco suffered the night she died, and how Buschauer was implicated in her death.

¶ 29    The State called forensic pathologist, Dr. Scott Denton; forensic pathologist, Dr. Stephen Cina; and medical examiner, Dr. Mary Case. Each doctor testified to the nature and extent of Hrisco's injuries and the manner of death.

¶ 30    Dr. Denton conducted Hrisco's autopsy on the day she died and originally listed her cause of death as "undetermined." But in 2010, Dr. Denton reviewed police reports previously unavailable. Based on this information and his additional 10 years of experience, he believed Hrisco's death a homicide. Dr. Denton said his examination revealed a healthy heart, thus ruling out a heart attack or cardiac arrhythmia. Also, Hrisco's toxicology examination came back "completely negative," demonstrating that she had no alcohol or drugs in her system.

¶ 31    During his external examination, Dr. Denton noticed injuries that belied an accidental drowning. He saw congestion, or dark red discoloration, on her upper chest. This indicated a compression prevented Hrisco's blood flow, which would not occur in an accidental drowning. He

saw petechial hemorrhaging in her left eye consistent with pressure on her chest. In addition, he described 10 different abrasions on Hrisco's body, including fresh injuries on her nose, chin, and other parts of her face and significant injuries on her knees. These abrasions indicated a hard surface had struck her at or near the time of death. Abrasions on the back of her left arm and across both knuckles suggested a struggle to avoid being forcibly held underwater.

¶ 32    Dr. Denton's internal examination revealed a deep horizontal bruise, "about the size of a thumb," on the left side of her neck. He described this bruise as recent, occurring near the time of death. This type of bruising suggested that someone pressed down on the back of Hrisco's neck with their hands.

¶ 33    Dr. Cina, the chief medical examiner for Cook County in 2012, testified that, after reviewing the materials related to Hrisco's death, he concluded Hrisco was a victim of homicide. He based his conclusion on the absence of natural disease; the negative toxicology screens; and her injuries, rigor, and lividity findings coinciding with being facedown in a bathtub. Accordingly, Dr. Cina updated Hrisco's death certificate to reflect her official manner of death as homicide from having been "forcibly submerged in [a] bathtub."

¶ 34    On rebuttal, the State called Dr. Case, who agreed with Drs. Denton and Cina on Hrisco's manner of death. She testified that, based on the injuries, "[s]omeone ha[d] forcibly held her down." Dr. Case dispelled the possibility that Hrisco could have fainted while in the bathtub, causing her to slip below the water and drown. She explained, if this were to happen, Hrisco's natural preservation instincts would kick in and she would be aroused from her unconsciousness. Nor were the injuries consistent with the possibility of a seizure. Instead, Dr. Case explained that Hrisco's injuries compared favorably with other forcible drownings she had seen. Dr. Case was unconcerned that Hrisco's injuries had not been more extensive.

¶ 35    The State called three longtime friends of Hrisco's: Deborah Kram, Jodi Kindle, and Cheryl Kolweier. Each described their interactions with Buschauer and what Hrisco told them about her relationship with Buschauer in the months leading up to her death.

¶ 36    Kram testified that in October 1998, Hrisco told her about a fight she and Buschauer had over building their home. Hrisco said that, in the heat of the argument, Buschauer "threatened to kill her if she were to pursue" legal action against his cousin and put both his hands around her neck. Kram said Hrisco told her about the increasing strain on their relationship due to arguments over the house. Hrisco described Buschauer as a "Dr. Jekyll and Mr. Hyde" who would suddenly become angry and unreasonable. Four days before her death, Hrisco told Kram she and Buschauer were continuing to have marital problems. Hrisco said Buschauer blamed her, and marriage counseling had made matters worse.

¶ 37    Jodi Kindle testified that she attended the same Bible study gatherings as Hrisco and Buschauer. During these gatherings, Hrisco often spoke about issues she and Buschauer were having over the construction of their house and that Buschauer would become "noticeably irritated, uncomfortable," his face would turn red, and "[h]is eyes would bug out." A week before Hrisco's death, she told Kindle her relationship with Buschauer was "worse than ever," "[s]he felt he hated her," and "she was afraid" of him. After Hrisco's death, Kindle attended her funeral and offered condolences to Buschauer. Kindle said he responded by smiling and saying, "there's a lot of things I could do now that Cynthia is gone."

¶ 38    Finally, Cheryl Kolweier testified that in the late summer or fall of 1999, Hrisco told her about a physical altercation with Buschauer. Hrisco seemed scared when telling how Buschauer took her by the shoulders, shook her, and threatened to kill her if she did not "back off talking to the cousin or putting pressure on the cousin about the house." Hrisco told Kolweier that the look

on Buschauer's face when he said these things scared her the most. Kolweier testified that she babysat Hrisco and Buschauer's baby son while police interviewed Buschauer in March 2000. Buschauer called to check on the baby and, in the course of conversation, told her he did not know if he killed Hrisco in a "fit of rage or not. He just couldn't remember."

¶ 39    After the State rested, Buschauer called a pathologist who presented an alternative theory on Hrisco's death. Dr. Christopher Milroy, director of the forensic pathology unit of the Eastern Ontario (Canada) Regional Forensic Pathology Unit, agreed with the State's experts that Hrisco drowned but disagreed with the finding of homicide. Milroy said Hrisco could have fainted while she was in the bathtub, slipped under the water, inhaled water, and, as a result, suffered a seizure— which would explain her injuries. He did not believe sufficient evidence existed to show someone forcibly held Hrisco underwater due to the absence of more significant injuries. On cross-examination, however, Dr. Milroy admitted there was no evidence Hrisco suffered a seizure and denied speculating about how she died. He also conceded that Hrisco "certainly *** could have been" held facedown under the water and that the deep bruise on her neck could have been caused by pressure from fingers.

¶ 40    Buschauer called longtime friend, Heather Roy; his cousin's wife, Maryann Antemann; and attorney Philip Maksymonko. Each testified about their knowledge of Hrisco and Buschauer's troubled marriage.

¶ 41    Roy testified that she and her husband knew Buschauer and Hrisco for four years through a group bible study. Hrisco never spoke to her about marital issues, nor had Buschauer ever threatened or frightened her. And Hrisco never told her about issues over their South Barrington house. Roy and her husband remained friends with Buschauer after Hrisco's death.

¶ 42    Antemann testified that she married Buschauer's cousin. Starting in January 1999, she and her husband and Hrisco and Buschauer tried to mediate the construction issues, but the mediation sessions came to naught.

¶ 43    Maksymonko testified he formerly represented Hrisco and Buschauer and helped them with business-related legal issues. Hrisco and Buschauer spoke to him about their dispute with Buschauer's cousin. Hrisco never told Maksymonko that she was afraid of Buschauer or that he had threatened to kill or hurt her. Maksymonko conceded that he did not find it unusual for Hrisco to keep silent on marital relationship issues.

¶ 44    After the parties rested, the trial court acknowledged that the case presented much circumstantial evidence and, as a domestic situation, circumstantial evidence could properly be considered. Accordingly, the trial court found Buschauer guilty of first degree murder and sentenced him to 25 years in the Department of Corrections. Buschauer appeals his conviction and asks for a new trial.

¶ 45                                    Analysis

¶ 46    Buschauer makes several arguments that the trial court erred by allowing the State to introduce the video of his interrogation on April 24, 2013. First, he claims the officers and prosecutors involved in his interrogation violated the Illinois Constitution's due process clause (see Ill. Const. 1970, art. I, § 2) by (i) misrepresenting the nature of the interrogation as voluntary and (ii) failing to tell him they had a warrant for his arrest when they asked him to accompany them to the station. He also argues the officers' tactics violated both his right against self-incrimination and right to counsel under both the United States and Illinois Constitutions. See U.S. Const., amends. V, VI; Ill. Const. 1970, art. I, §§ 8, 10. These arguments grow from the same root as Buschauer's due process argument: the officers' decision to withhold information that they had a warrant for his

arrest (i) undermined his ability to waive his *Miranda* rights knowingly and intelligently and (ii) frustrated his ability to retain counsel promptly.

¶ 47     The State responds that information about the arrest warrant issued for Buschauer at most "affected the wisdom" of invoking his *Miranda* rights, not his ability to waive them knowingly and intelligently. The State further argues that Buschauer failed to claim that he was in custody at the time of the videotaped statement, comparing the 2013 interrogation to this court's previous finding that the interviews officers conducted in 2000 were not custodial. See *Buschauer*, 2016 IL App (1st) 142766, ¶ 36 (finding reasonable person would have felt free to leave under circumstances of interrogation). As to Buschauer's right to counsel, the State claims the right did not attach by mere issuance of the arrest warrant but, even if it had, Buschauer's *Miranda* waiver was still effective. Finally, the State argues the officers' decision to keep hidden the information about the arrest warrant cannot violate Illinois's due process clause because Buschauer had no right to the information in the first place.

¶ 48     The trial court properly denied Buschauer's motion to suppress the video of the April 2013 interrogation, and we will explain our reasoning in detail as it relates to each constitutional provision Buschauer invokes.

¶ 49                                        *Due Process*

¶ 50     Illinois courts are not bound to interpret the due process clause of our constitution (Ill. Const. 1970, art. I, § 2) coextensively with the due process clause of the United States Constitution. *People v. McCauley*, 163 Ill. 2d 414, 440-41 (1994). The heart of our constitution's due process guarantee is "fundamental fairness." (Internal quotation marks omitted.) *Id.* at 441. So, our due process clause "essentially requires fairness, integrity, and honor in the operation of the criminal [legal] system, and in its treatment of the [person]'s cardinal constitutional protections." (Internal

quotation marks omitted.) *Id.* We embrace this lofty language, on which Buschauer chiefly relies. But the due process clause does not apply to these facts.

¶ 51        Buschauer focuses on one aspect of the 2013 interrogation that he believes rendered it unfair: the officers' failure to mention that they had already secured a warrant for his arrest when they asked him to accompany them to the police station. But the narrowness of Buschauer's claim defeats it because he had no right to the information about the warrant.

¶ 52        The key to our supreme court's decision in *McCauley* was the defendant's vested right to have an attorney present during an interrogation. See *id.* at 444 ("*If* a defendant is *entitled* to the benefit of an attorney's assistance and presence during custodial interrogation and this right is guarded, certainly fundamental fairness requires that immediately available assistance and presence not be denied by police authorities." (Emphases added.)). The court's focus was the myriad ways the right to counsel had historically been protected in Illinois courts, through constitutional interpretation and statutes. *Id.* at 441-43. To implicate due process, police conduct must "interfere with a suspect's right" given by the constitution or statutory law. *Id.* at 444. Many of the other cases Buschauer relies on confirm this principle. See *People v. Stapinski*, 2015 IL 118278, ¶ 52 (substantive due process rights violated where "State breached the agreement *** entered into with defendant"); *People v. Starks*, 106 Ill. 2d 441, 452-53 (1985) (due process right to enforce nonprosecution agreement attached when agreement was fully executed between defendant and State); *People v. Smith*, 233 Ill. App. 3d 342, 351 (1992) (affirming dismissal of charges where State violated due process by promising defendant immunity and failing to make good on promise). For the officers' conduct to implicate due process, Buschauer must have had a right to the information he claims the officers withheld.

¶ 53    Buschauer, however, cites no source of law giving him a right to know the officers had a warrant for his arrest when they otherwise convinced him to accompany them to the police station voluntarily. Absent authority, we are left with the distinction Illinois courts have long drawn between information essential to a knowing waiver of constitutional rights and "a flow of information to help [a defendant] calibrate his self-interest in deciding whether to speak or stand by his rights." (Internal quotation marks omitted.) See *People v. Bernasco*, 138 Ill. 2d 349, 359 (1990). Knowing that officers had a warrant for his arrest would certainly have "affect[ed] *** the wisdom of [Buschauer's] *Miranda* waiver" (internal quotation marks omitted) (see *id.* at 359-60), but we have found no case suggesting this knowledge is required to satisfy due process.

¶ 54    We are not unsympathetic to Buschauer's claim and believe it unethical to lie to suspects to obtain information. Our General Assembly has banned similar deceptive practices in taking juvenile confessions. See Pub. Act 102-101, § 5 (eff. Jan. 1, 2022) (adding 705 ILCS 405/5-401.6). But absent a source of law vesting Buschauer with a right to the information he seeks, the due process clause of the Illinois Constitution is not a code of ethics for police or prosecutors. And, though we do not condone the officers' conduct, where their lie by omission served to make the circumstances of Buschauer's interrogation arguably less coercive, we cannot say their deceptive tactics were "oppressive, arbitrary, or unreasonable."

¶ 55    To the extent questions of voluntariness remain, we now address them.

¶ 56    *Self-Incrimination & Counsel*

¶ 57    We address Buschauer's claims about the protection against self-incrimination and the right to counsel together. They both rely on the same foundational premise: Buschauer did not have enough information to validly waive either right because officers never told him "that he had already been charged with first degree murder." The State responds that Buschauer had enough

information and sophistication to validly waive both rights without knowing every detail about the progress of the officers' investigation. We agree with the State that neither the United States Constitution nor current interpretations of the Illinois Constitution require officers to inform a defendant about an arrest warrant before giving *Miranda* warnings. Nothing in the record before us, therefore, renders involuntary Buschauer's waiver of his right against self-incrimination or waiver of his right to counsel.

¶ 58    The United States and Illinois Constitutions protect defendants from compelled self-incrimination. U.S. Const., amend. V ("No person shall be *** compelled in any criminal case to be a witness against [him or her]self ***."); Ill. Const. 1970, art. I, § 10 ("No person shall be compelled in a criminal case to give evidence against [him or her]self ***."). Both constitutions similarly protect the right to counsel. U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for [his or her] defence."); Ill. Const. 1970, art. I, § 8 ("In criminal prosecutions, the accused shall have the right to appear and defend *** by counsel ***.").

¶ 59    Buschauer's briefs repeatedly intertwine the constitutional provisions on which he relies. Though it is ultimately irrelevant to our conclusion, we find that disentangling them will be helpful. The United States Supreme Court, in *Miranda*, 384 U.S. at 467, set out to protect the fifth amendment privilege against self-incrimination "outside criminal court proceedings." The Court's main concern was protecting suspects from the psychologically coercive pressures of custodial interrogation. *Id.* at 446-58 (concluding by noting "intimate connection between the privilege against self-incrimination and police custodial questioning"). Included in the prophylactic rule *Miranda* adopted is the requirement that officers inform a suspect in a custodial interrogation that he or she has the right to counsel. *Id.* at 444-45.

¶ 60        The right to counsel embodied in the sixth amendment, however, protects different interests at different times. The sixth amendment right to counsel does not attach until "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." (Internal quotation marks omitted.) *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Because the initiation of new criminal proceedings triggers the sixth amendment right to counsel, the United States Supreme Court has described the sixth amendment right as "offense specific." *Id.* This makes sense, so we are told, because of the sixth amendment's goal—to protect a criminal defendant from the State at critical stages of an already-initiated criminal prosecution, once "the adverse positions of government and defendant have solidified." (Internal quotation marks omitted.) *Id.* at 177-78. Compare that to *Miranda*'s prophylactic protection of the right to counsel—it is aimed at a suspect's more general interest in "deal[ing] with the police only through counsel." (Internal quotation marks omitted.) *Id.* at 178; see also *People v. Kidd*, 147 Ill. 2d 510, 532 (1992) (adopting *McNeil*'s distinction between defendant's invocation of sixth amendment right to counsel versus right to counsel protected by *Miranda*'s prophylactic rule for custodial interrogations).

¶ 61        The structure of the Illinois Constitution suggests a similar distinction. Though we have found no case holding as much, *McCauley* comes close. Article I, section 10, of the Illinois Constitution protects an accused's right against self-incrimination, and the focus appears on custodial interrogations like the federal counterpart. See *McCauley*, 163 Ill. 2d at 421-22. By contrast, article I, section 8, of the Illinois Constitution protects a defendant's right to counsel when "adversary judicial proceedings have been initiated." *Id.* at 447. This limitation dovetails with both interpretations of the coordinate sixth amendment and the text of the Illinois Constitution, which

includes the right to counsel under the heading "Rights After Indictment." Ill. Const. 1970, art. I, § 8.

¶ 62     This distinction matters, at least theoretically. If issuing a complaint and securing an arrest warrant initiate the criminal prosecution, then Buschauer's sixth amendment right to counsel (and his right to counsel under article I, section 8, of the Illinois Constitution) attached automatically for the offense of first degree murder. On the other hand, if the complaint and warrant did not initiate criminal proceedings, then his right to counsel would be protected by *Miranda* (and article I, section 10, of the Illinois Constitution) and would not attach until a custodial interrogation.

¶ 63     While the philosophy of the differing origins of the right to counsel is interesting to ponder, the distinction ultimately evaporates here for one reason: officers gave Buschauer *Miranda* warnings. See *Patterson v. Illinois*, 487 U.S. 285, 292-93 (1988) (even where sixth amendment right to counsel had attached, defendant can validly waive right in response to receiving *Miranda* warnings, so long as waiver was otherwise valid); see also *People v. Rudd*, 2020 IL App (1st) 182037, ¶ 77 ("when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically serves to waive any sixth amendment right to counsel as well" (internal quotation marks omitted)).

¶ 64     In most cases where officers give *Miranda* warnings, the precise moment that fifth and sixth amendment protections attach will matter little in waiving those rights and speaking to police. For example, we can assume without deciding that Buschauer's right against self-incrimination and right to counsel attached at the earliest possible moment—in the YMCA parking lot—because, at the end of the day, we must answer the question: Was Buschauer's *Miranda* waiver valid? We conclude that it was.

¶ 65     Any waiver of rights following *Miranda* warnings must be voluntary, knowing, and intelligent. *People v. Soto*, 2017 IL App (1st) 140893, ¶ 68. To be voluntary, the waiver must not be "the product of intimidation, coercion, or deception." *Id.* To be knowing, the waiver must be "made with a full awareness of the nature of the rights being waived and the resulting consequences of waiving those rights." *Id.* A suspect need not know "every possible consequence of a waiver" for us to accept the waiver as valid. *People v. Braggs*, 209 Ill. 2d 492, 515 (2003) ("defendant need not understand far-reaching legal and strategic effects of waiving his or her rights or appreciate how widely or deeply an interrogation may probe"). A *Miranda* waiver's validity depends on each case's circumstances. *Id.* To guide us, we can look to factors like the defendant's age, intelligence, background, mental capacity, education, and conduct. *Id.*

¶ 66     Buschauer does not focus on these traditional factors, nor do we think he could. As the trial court found, Buschauer was 64 years old with no apparent cognitive difficulty. As a retired chemical engineer, he had a substantial education. We also know a lot about his conduct with police. He had been interviewed about his wife's death in 2000 and invoked his *Miranda* rights. We find the State on solid ground when it argues that Buschauer "at least basically" understood the *Miranda* warnings and the consequences of waiver. So, the trial court's factual findings on this score were not against the manifest weight of the evidence.

¶ 67     Buschauer focuses instead on the officers' conduct. He argues that his *Miranda* waiver could not have been knowing and voluntary where he did not know the officers had an arrest warrant. He also emphasizes the warrant's directive that he be brought before a judicial officer immediately after arrest. The State argues the officers were under no affirmative obligation to give Buschauer this information and, even if they were, their failure would not have impacted the knowing and voluntary nature of Buschauer's *Miranda* waiver.

¶ 68      We rejected an argument similar to Buschauer's in *Rudd*, where officers had filed a complaint and received a warrant for the defendant's arrest before asking him to voluntarily accompany them to an out-of-state police station for questioning. *Rudd*, 2020 IL App (1st) 182037, ¶¶ 22-25. We held that knowledge about the existence of the unexecuted arrest warrant would not have affected the defendant's "aware[ness] of the gravity of his situation," based on the officers asking the defendant to come with them to a police station and reading the defendant the *Miranda* warnings. *Id.* ¶ 80. We reached this conclusion relying on the nature of the *Miranda* warnings, which advise a suspect of " 'the ultimate adverse consequence' " of having anything they say used against them at a potential future trial. *Id.* ¶ 79 (quoting *Patterson*, 487 U.S. at 293). Whether a suspect knows about a warrant, the *Miranda* warnings convey the possibility of future prosecution. See *id.* ¶¶ 79-80.

¶ 69      Buschauer urges several factual differences between his interrogation and *Rudd*, but we find none legally significant. First, Buschauer points out that an assistant state's attorney went with the officers to procure his arrest warrant, whereas the officers acted on their own in *Rudd*. We think this distinction slightly misreads *Rudd*. Although the assistant state's attorney was not present during the warrant application to the judge, she had approved of and directed the officers to seek the arrest warrant. *Id.* ¶ 22. More importantly, the involvement of the state's attorney's office goes to the question of when the adversarial process against Buschauer was initiated (an issue we have assumed in Buschauer's favor), not whether his *Miranda* waiver was knowing and voluntary. See *id.* ¶ 71.

¶ 70      In addition, Buschauer asks us to distinguish *Rudd* because officers told the defendant he was a murder suspect during the interview. *Id.* ¶ 23. We do not think this is a meaningful distinction because Buschauer knew the officers wanted to know about his wife's death. We see no factual

difference between the interrogation in *Rudd* and Buschauer's interrogation that would convince us to disregard *Rudd*.

¶ 71　　Alternatively, Buschauer asks us to conclude we got the law wrong in *Rudd*, and here we have some sympathy. Under its own state constitution, the New Jersey Supreme Court has concluded that "failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights." *State v. A.G.D.*, 835 A.2d 291, 298 (N.J. 2003). The court found the officers' failure to inform the defendant of the criminal complaint and arrest warrant required suppression of the defendant's Mirandized statement. *Id.* at 297-98.

¶ 72　　The reasoning of the New Jersey Supreme Court has some intuitive appeal, but Buschauer has not given us enough on which to anchor an extension of our own constitution in the same way. We acknowledge, of course, that we are a "limited lockstep" jurisdiction. *People v. Caballes*, 221 Ill. 2d 282, 309-10 (2006). This means we interpret provisions of the Illinois Constitution consistently with federal interpretations of analogous provisions of the United States Constitution unless the text, "state tradition and values," or "long-standing state case precedent," indicate the drafters of our constitution intended a more expansive interpretation. *Id.* at 314. Aside from brief mentions of the relevant provisions of the Illinois Constitution, Buschauer makes no persuasive argument that we should interpret them more expansively than their federal counterparts. See *A.G.D.*, 835 A.2d at 297-98 (describing common-law tradition of protecting against self-incrimination in New Jersey and the New Jersey Supreme Court's conclusion that its privilege provides greater protection than United States Constitution).

¶ 73　　For now, we adhere to *Rudd* and find that an officer's failure to inform a suspect that they have a warrant for his arrest does not defeat the validity of an otherwise proper *Miranda* waiver.

No one should read our conclusion to foreclose, in an appropriate case with fully developed arguments, that the Illinois Constitution (like its New Jersey counterpart) forbids the kind of deception the officers employed against Buschauer.

¶ 74                                    *Hearsay and Confrontation Claims*

¶ 75        Buschauer attacks the admission of testimony from Kram, Kindle, and Kolweier about statements Hrisco made to them before her death. The statements explain the tension in the marriage and the threatening acts Buschauer had committed against her. Buschauer offers two theories: (i) the statements were hearsay and not admitted for a proper nonhearsay purpose and (ii) admitting the statements violated his rights under the United States and Illinois Constitutions to confront witnesses against him. The State responds that the trial court properly admitted the statements for the nonhearsay purpose of proving motive and, because Hrisco did not make the statements to law enforcement, they were nontestimonial and, so, admitting them did not violate Buschauer's confrontation rights. We agree with the State.

¶ 76                                         *Hearsay Testimony*

¶ 77        Buschauer argues the testimony given by Hrisco's friends invoked impermissible "voice from the grave" hearsay and admitting the statements at trial amounted to prejudicial error. The State responds that it offered the statements to prove motive, not their truth, so they were not hearsay. We agree that motive supplies a well-established, nonhearsay purpose to admit out-of-court statements that would otherwise be hearsay. Hence, the trial court's evidentiary ruling was not an abuse of discretion.

¶ 78        Hearsay denotes a statement made by an out-of-court declarant that is offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). The parties' dispute focuses on the latter half of the definition—whether the witnesses' testimony about Hrisco's statements were

offered for the truth. The parties essentially talk past each other, offering a veritable jumble of theories on which to justify either admitting or excluding the testimony.

¶ 79        Buschauer relies largely on cases that discuss and apply Illinois Rule of Evidence 803(3) (eff. Mar. 24, 2022), dealing with the then-existing-state-of-mind hearsay exception. Rule 803(3) does not bar testimony about the declarant's out-of-court statements when they convey "the declarant's then existing state of mind *** such as *** motive." *Id.*; see also *People v. Floyd*, 103 Ill. 2d 541 (1984); *People v. Munoz*, 398 Ill. App. 3d 455 (2010); *People v. French*, 2017 IL App (1st) 141815. But, we invoke the exception in Rule 803(3) when the *declarant's* state of mind is at issue. See *Floyd*, 103 Ill. 3d at 546-57; *Munoz*, 398 Ill. App. 3d at 480-82; *French*, 2017 IL App (1st) 141815, ¶ 35. Applying Rule 803(3) makes little sense because the State introduced evidence of Hrisco's statements to prove *Buschauer*'s state of mind (motive), not Hrisco's.

¶ 80        The State, for its part, seeks a different avenue for admitting motive testimony, relying on cases that have allowed hearsay testimony as part of the proof of other crimes to establish the defendant's motive. See *People v. Lovejoy*, 235 Ill. 2d 97, 135-38 (2009); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) ("[e]vidence of other crimes, wrongs, or acts" "may also be admissible for other purposes, such as proof of motive"). But most of the disputed statements did not involve any previous crimes or bad acts by Buschauer.

¶ 81        The State is on solid footing, however, with cases like *People v. Moss*, 205 Ill. 2d 139 (2001), and *People v. Coleman*, 2014 IL App (5th) 110274, which engaged in the far simpler factual analysis of whether the statements had been offered to prove motive or for their truth. In *Moss*, our supreme court approved the use of a deceased victim's out-of-court statements about a sexual assault the defendant committed against her before he killed her. *Moss*, 205 Ill. 2d at 144-46, 160. The court held that the victim's statements need not have conveyed what "actually occurred"

because, whether true or not, the details led to criminal charges against the defendant and instructions to his family to " 'get rid of' " the victim. *Id.* at 160.

¶ 82    In *Coleman*, the court found no error in admitting testimony from a murder victim's friends that the victim had told them her husband "wanted a divorce because he believed she and the boys were holding him back from realizing his full potential, but he did not want to jeopardize his job by filing for divorce." *Coleman*, 2014 IL App (5th) 110274, ¶ 139. The court concluded that the statements were properly admitted for purposes of proving motive. *Id.* As we read *Coleman*, the defendant's beliefs about the reasons he wanted but could not obtain a divorce need not have been factually accurate—the defendant need only have thought them true. So the victim's out-of-court statements about the defendant's beliefs were not offered for the truth they assert.

¶ 83    When it comes to many of the statements Hrisco made to her friends before she died, we confront a tension, bordering on contradiction, infecting the theory of out-of-court statements about motive being nonhearsay. We find it hard to comprehend how an out-of-court statement about a fact (as opposed to an individual's perceptions, as in *Moss* and *Coleman*) could be relevant to prove a defendant's motive unless that same statement was substantively true. If the factual matter asserted in the disputed statement is *not* true, then it would have no tendency to prove motive and be irrelevant. *Munoz*, 398 Ill. App. 3d at 482 ("use of [the victim's out of court statements] to establish the defendant's motive would be a use to establish the truth of their content").

¶ 84    For our purposes, then, we break Hrisco's out-of-court statements into three basic categories: (i) statements about the disputes underlying her and Buschauer's marital problems, (ii) statements describing the state of her marriage, and (iii) statements about how Buschauer behaved or spoke to her. We conclude statements in the first category would not be offered for their

truth, statements in the second category would be, and statements in the third category could be interpreted either way. We provide examples of each to illuminate.

¶ 85    As to the first category, Hrisco made statements to her friends about the quality of work Buschauer's cousin did in building their house. For instance, Hrisco said that (i) Buschauer's cousin overcharged them for the cost of the home by a substantial sum and (ii) during an electrical storm, the power went out and the water in the hot tub would not get hot enough. These statements, and statements similar to them, need not be factually true to support the State's theory of motive. All that matters is whether Hrisco perceived problems with the craftsmanship of the home sufficient to lead to confrontation and ensuing marital strife. So these types of underlying fact-based statements are not offered for their truth.

¶ 86    This leads us to the second category. Hrisco described to all three friends the state of her marriage at various times. For example, Hrisco said that (i) she felt her marriage was worse than ever and she and Buschauer weren't living as husband and wife, (ii) the two would never talk while at home, and (iii) marital counseling was unsuccessful and Buschauer would often act more distant or angry after counseling sessions. These statements could not prove Buschauer's motive to kill unless substantively true. If Hrisco were available for cross-examination and the trier of fact disbelieved her characterizations of the couples' marriage, the trier of fact could disbelieve that Buschauer in fact had a motive to kill her. Put another way, if the couple were not *actually* experiencing marital strife, the State's theory of Buschauer's motive falls apart—the statements are offered for their truth, even though the truth they convey is Buschauer's motive to kill. The trial court erred in admitting these type of statements about the qualitative state of the marriage.

¶ 87    We arrive then, at the third category: statements about Buschauer's actions or words toward Hrisco. For example, Hrisco told her friends that Buschauer was physically abusive and told her

that, if she did not stop pressuring his cousin, he would kill her and then he shook her by the shoulders. These statements appear offered for their truth to prove motive because if Buschauer did not actually say or do them, it is less likely that he had a motive to kill. Yet the relevance of Buschauer's threats to motive does not depend on whether he *actually* intended to kill her when he made the threats. There is a reasonable interpretation of these type of statements, and the trial court would not have had to consider their truth for them to be relevant to motive. This means, then, that the trial court did not abuse its discretion in admitting this category.

¶ 88    The trial court's admission of hearsay testimony (here, the second category of statements) does not require reversal in every case. *People v. Moore*, 264 Ill. App. 3d 901, 911 (1994). We need not reverse if there is no reasonable probability that the trier of fact would have acquitted had the hearsay been excluded. *Id.* We agree with the State that much of the motive evidence had analogs in statements made by Buschauer. For example, in a letter to Hrisco, Buschauer recited almost the exact threat Hrisco claimed he made: "If we cannot resolve our conflict in a constructive manner then divorce is better than assault or murder." Buschauer also made statements to Hrisco's friends, implying after her death that he had killed her. He told one of them that "there's a lot of things [he] could do now that [Hrisco] is gone" and that "he didn't know if he did it in a fit of rage or not." We conclude sufficient independent circumstantial evidence exists of Buschauer's motive to kill Hrisco and many of Hrisco's statements about the qualitative state of her marriage were self-evident from the nonhearsay evidence. All in all, evidentiary error, if any, did not warrant reversal.

¶ 89                                    *Confrontation Clause*

¶ 90    Buschauer also argues Hrisco's statements to her friends, admitted through her friends' testimony, violated the confrontation clause. See U.S. Const., amend. VI ("In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him

\*\*\*."). The threshold question in determining whether out-of-court statements violate the confrontation clause is whether the statements are testimonial. See *People v. Hood*, 2016 IL 118581, ¶ 23 (discussing *Crawford v. Washington*, 541 U.S. 36 (2004)). The State disputes this threshold point and argues Hrisco's statements were not testimonial because they were not made with a future prosecution in mind.

¶ 91 Neither the United States Supreme Court nor the Illinois Supreme Court has set the outer boundary for the type of out-of-court statements that can be testimonial. Generally, however, there are three quintessential categories: (i) in-court testimony or its functional equivalent that took place outside the present proceedings (affidavits, previous testimony given without cross-examination, etc.); (ii) formalized extrajudicial statements (depositions, confessions); and (iii) statements made " 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " *People v. Cleary*, 2013 IL App (3d) 110610, ¶ 41 (quoting *Crawford*, 541 U.S. at 52). We are concerned just with the third category and find *Cleary* provides substantial guidance.

¶ 92 In *Cleary*, a murder victim's daughter testified that the victim told her that she was thinking about divorcing the defendant. *Id.* ¶ 8. The victim told her daughter to watch over her other two children in case " 'something bad was going to happen to her.' " *Id.* In addition, the victim told a friend that her marriage with the defendant was " 'rocky,' " and the defendant had threatened to kill her if she left him. *Id.* ¶ 9. The victim told her sister similar things, saying she wanted to leave her marriage but that she would "never make it out alive," and the defendant had said "he would kill her and burn the house down." *Id.* ¶ 10. The victim made similar statements to two other friends, telling one of them that the defendant had " 'hurt her before' " and both that the defendant had threatened to kill her before he would ever " 'let her' " out of the marriage. *Id.* ¶¶ 11-12.

¶ 93    *Cleary*, relying on *People v. Stechly*, 225 Ill. 2d 246 (2007), sets out the test for testimonial statements: (i) whether the statement was made in a solemn fashion (*e.g.*, under oath or after *Miranda* warnings) and (ii) whether the statement was intended to establish a particular fact for use in a future criminal prosecution. *Cleary*, 2013 IL App (3d) 110610, ¶¶ 47-48 (discussing *Stechly* in great detail). Consistent with *Cleary*'s discussion of *Stechly*, the United States Supreme Court's decision in *Ohio v. Clark*, 576 U.S. 237 (2015), recognized both the relative formality of the circumstances when the statement was made (*id.* at 245) and the statement's purpose (*id.* at 245-46) as factors to consider in determining whether a statement is testimonial.

¶ 94    Applying the *Stechly* test, the court in *Cleary* determined the victim's statements to her children and friends were not testimonial. First, the victim did not make her statements in a solemn way—she spoke to her children and friends, and the statements were not memorialized or sworn. *Cleary*, 2013 IL App (3d) 110610, ¶ 58. The court also noted that the victim did not make her statements intending to prove a particular fact at a hypothetical future prosecution of the defendant. *Id.* ¶ 57. The court imagined several other purposes for the victim's statements from explaining why she remained in her relationship, sharing her feelings, or crying for help. *Id. Cleary*'s analysis grafts almost perfectly onto Hrisco's statements. Hrisco's statements were of the same type— explaining past abuses and present fears. She also made her statements to a similar group of people—friends and acquaintances. Nothing indicates that Hrisco intended her statements for future prosecution of her murder or that she took steps to solemnify her statements in sworn testimony or to the police.

¶ 95    The Fourth District has adopted a *per se* rule that, without government involvement in eliciting or receiving, the statement will never be testimonial. *People v. Richter*, 2012 IL App (4th) 101025, ¶ 135. The Third District declined to adopt the same *per se* rule for a well-explained set of

reasons we need not repeat. See *Cleary*, 2013 IL App (3d) 110610, ¶¶ 64-67. The State has cited *Richter* but has not expressly asked us to adopt its *per se* rule. We see no need to take a firm position, though we surmise the United States Supreme Court's decision in *Clark* calls *Richter*'s *per se* rule into doubt. See *Clark*, 576 U.S. at 246 ("Because at least some statements to individuals who are not law enforcement officers could conceivably raise confrontation concerns, we decline to adopt a categorical rule excluding them from the Sixth Amendment's reach."). For our purposes, we find *Cleary*'s reasoning persuasive and applicable to Hrisco's statements.

¶ 96     We conclude that Hrisco's statements to her friends were not testimonial and, thus, did not implicate the sixth amendment's confrontation clause. Accordingly, the trial court committed no constitutional error in admitting them.

¶ 97     Affirmed.

*People v. Buschauer*, 2022 IL App (1st) 192472

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-CR-9408; the Hon. Joseph Michael Cataldo, Judge, presiding. |
| **Attorneys for Appellant:** | Allan A. Ackerman, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |